OLD COLONY BONDHOLDERS et al. v. NEW YORK, N. H. & H. R. CO.

Nos. 200 and 89, Docket No. 20048.

Circuit Court of Appeals, Second Circuit.

Jan. 13, 1947.

Writ of Certiorari Denied June 23, 1947.

See 67 S.Ct. 1754.

414

416

FRANK, Circuit Judge, dissenting in part.

———◆———

See also 64 F.Supp. 487.

Ely, Bradford, Thompson & Brown, Joseph B. Ely, and Richard Ely, all of Boston, Mass. (Seibert & Riggs, of New York City, of counsel), for appellant Protective Committee for Bonds of Old Colony Railroad Company.

Robert H. Davison, of Boston, Mass. (Haussermann, Davison & Shattuck, of Boston, Mass., of counsel), for appellant Webster & Atlas National Bank of Boston, Trustee.

Damon E. Hall and Rutherford E. Smith, both of Boston, Mass. (Hurlburt, Jones, Hall & Bickford, of Boston, Mass., of counsel), for appellant Mutual Savings Bank Group Committee for Boston Terminal Co. Bonds.

Henry W. Anderson and Lewis F. Powell, Jr., both of Richmond, Va., and Curtiss K. Thompson, of New Haven, Conn. (Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., and Parmelee & Thompson and Thompson, Weir & MacDonald, all of New Haven, Conn., of counsel), for appellant Institutional Group for Boston Terminal Bonds.

Clarence A. Barnes, Atty. Gen., and George P. Drury, Asst. Atty. Gen., both of Boston, Mass., for appellant Commonwealth of Massachusetts.

Oliver & Donnally, of New York City (Fred N. Oliver and Willard P. Scott, both of New York City, of counsel), for appellee Mutual Sav. Bank Group.

Ropes, Gray, Best, Coolidge & Rugg, of Boston, Mass. (Charles A. Coolidge, of Boston, Mass., of counsel), for appellee Old Colony R. Co. Plan Committee.

Stewart & Shearer, of New York City (William A. W. Stewart and McCready Sykes, both of New York City, of counsel), for appellee United States Trust Co. of New York, Trustee of Harlem River & Port Chester Mortgage.

Root, Clark, Buckner & Ballantine, of New York City (William P. Palmer and Philip E. Gregg, both of New York City, of counsel), for appellee Bank of NewYork, Trustee under New England R. Co. Mortgage.

Wm. Meade Fletcher, Jr., of Washington, D. C., for appellee Reconstruction Finance Corporation.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City (Edwin S. S. Sunderland, Judson C. McLester, Jr., James L. Homire and William D. Tucker, Jr., all of New York City, of counsel), for appellee Insurance Group.

Choate, Hall & Stewart, of Boston, Mass. (John L. Hall, James Garfield, and Charles H. Stockton, all of Boston, Mass., of counsel), for appellee New York, N. H. & H. R. Co., debtor.

White & Case, of New York City (Fitz-hugh McGrew and Jesse E. Waid, both of New York City, of counsel), for appellee Bankers Trust Co., Trustee First and Refunding Mortgage.

Davies, Auerbach, Cornell & Hardy, of New York City (H. C. McCollom, of New York City, of counsel), for appellee Irving Trust Co., Trustee 6% Collateral Trust Indenture.

Beers & Beers, of New Haven, Conn. (Edmund Ruffin Beckwith, of New York City, of counsel), for appellee Protective Committee for Holders of Boston and New York Air Line First Mortgage 4% Bonds.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

SWAN, Circuit Judge.

On March 6, 1944, the district court approved a plan of reorganization for the New York, New Haven & Hartford Railroad Company, principal debtor, as certified in the Fifth Supplemental Report and Order of the Interstate Commerce Commission. One feature of the plan was the acquisition by the reorganized New Haven of the assets of Old Colony Railroad Company, a secondary debtor.[1] The order of approval was brought up to this court by numerous appellants, including the Protective Committee for Bonds of Old Colony. Upon the Committee's appeal the district court's order was reversed "so that the Commission may make its own independent findings of value and of price." In re New York, New Haven & Hartford R. Co., 2 Cir., 147 F.2d 40, 50. Thereafter, on February 13, 1945, the district court referred the plan back to the Commission, but only for limited purposes. The terms of the order of reference are set out in In re New York, New Haven & Hartford R. Co., 2 Cir., 150 F.2d 169, where this court upheld the order against the charge that it did not conform to our mandate. After the plan was referred back to the Commission the Protective Committee for Bonds of Old Colony requested the Commission to hold further hearings and to reconsider its findings with respect to the price to be paid for the Old Colony properties in the light of material changes in conditions that have occurred since the close of the hearings before the Commission in 1942. The Commission, however, denied the request and without further hearings made, on May 14, 1945, its Sixth Supplemental Report and Order, reported in 261 I. C. C. 195. This effected no change whatever in the plan reported in its Fifth Supplemental Report and Order, but it discussed in detail the evidence presented on previous hearings relating to the elements of value comprising the Old Colony properties and it stated the reasons which led the Commission to adhere to the same purchase price as it had formerly approved. When the Sixth Supplemental Report and Order came on for hearing before the district court, the present appellants again filed objections

---

[1] New Haven filed its petition for reorganization on October 23, 1935. On June 3, 1936, Old Colony filed its petition in the same proceeding. The Interstate Commerce Commission, after hearings, reported a plan of reorganization in 1940, 239 I.C.C. 337. This plan did not include Old Colony. On rehearing before the full Commission a modified plan was proposed which did include Old Colony, 244 I.C.C. 239. On March 25, 1941 modifications of the plan were proposed by the Second Supplemental Report and Order, 244 I.C.C. 521. In December 1941 the District Judge disapproved the plan and recommended to the Commission a report of a Compromise Committee. See 254 I.C.C. 63, 64. In February 1942 further hearings were had before the Commission; the hearings were kept open until April 4, 1942

for receipt of the "Joint Report" of the Compromise Committee. On October 6, 1942 the Commission filed its Third Supplemental Report, incorporating in the reorganization plan the provisions of the Joint Report, 254 I.C.C. 63. Certain parties moved for rehearing which was denied and the plan was again submitted in the Commission's Fourth Supplemental Report and Order, 254 I.C.C. 405. The district judge disapproved the plan in some respects and invited the Commission to file a further report. In re New York, N. H. & H. R. Co., D.C., 54 F.Supp. 595. Its Fifth Supplemental Report and Order was filed on February 8, 1944, 257 I.C.C. 9. The plan proposed therein was approved by the District Judge on March 6, 1944 in 54 F. Supp. 631.

418

to the plan and offered evidence in support thereof, but the district court determined that the evidence did not require a return of the proceedings to the Commission and, on September 6, 1945, made the two orders which the present appeals bring up for review. The first (No. 821)[2] is in effect an order approving the plan; the second (No. 822) confirms the plan.[3]

## I. Appeal of Protective Committee for Bonds of Old Colony.

■■■ 1. The appellant contends that certification by the Commission of its Sixth Supplemental Report and Order without the granting of a hearing after the plan was referred back to it was a procedure inconsistent with the opinions and mandate of this court and contrary to the requirements of Section 77, Bankr.Act, 11 U.S.C.A. § 205; consequently the Commission's Report and Order were invalid and the district court's orders based thereon are erroneous. In its former opinions this court did not determine whether the Commission was required to hold a hearing after the Old Colony features of the plan of reorganization were referred back. We held that the Commission's prior Reports and Orders were defective in that the price proposed for Old Colony properties appeared to be a figure arrived at by compromise and not by an independent exercise of judgment by the Commission, and we reversed the court's order of approval "so that the Commission may make its own independent findings of value and of price." We recognized that the Commission might "wish to take additional evidence and to modify the plan in the light of new facts," 147 F.2d 40, 54; but

there is nothing in our opinions which required the taking of evidence. So far as the appellant's argument rests on supposed inconsistency between the procedure adopted by the Commission and the procedure directed by our opinion, it is based on a faulty premise.

There is more substance to the statutory argument, but we are not convinced by it. Subsection e of section 77, 11 U.S.C.A. § 205, sub. e, provides that if, upon disapproval of the plan, the proceedings are referred back to the Commission, "it shall proceed to a reconsideration of the proceedings under the provisions of subsection (d) of this section." Subsection d provides

"After the filing of such a plan, the Commission * * * shall, after due notice to all stockholders and creditors given in such manner as it shall determine, hold public hearings, at which opportunity shall be given to any interested party to be heard, and following which the Commission shall render a report and order in which it shall approve a plan * * *"

The appellant argues that our reversal of the district court's order of approval based on the Fifth Supplemental Report and Order was a judicial disapproval of the plan and rendered mandatorily applicable the above quoted statutory provisions. But the Commission rejected this argument and we agree with its rejection. The provisions relating to Old Colony constituted but one portion, although an important one, of a comprehensive plan for both the principal debtor and the several subsidiary debtors. Our disapproval of the Old Colony provisions was upon a very narrow ground, namely, that the Commission's Report did

[2] It orders "That the record of this Court in the proceedings upon a plan be enlarged to include said Sixth Supplemental Report and Order of the Interstate Commerce Commission together with all evidence received at the hearing herein and that the order of this Court of March 6, 1944 (Order No. 734) approving the plan as contained in the Fifth Supplemental Order of the Commission, being consistent with the requirements of the appellate opinions of January 2, 1945, and January 23, 1945, 147 F.2d 40, and with the appellate mandate of January 30, 1945, in the light of

the record as thus enlarged, in all respects be reinstated as an order of this Court in full force and effect."

[3] During the pendency of the appeals from the order of March 6, 1944 approving the plan, the Commission submitted the plan to be voted upon and, on December 29, 1944, certified to the district court that the plan had been accepted by all classes of creditors entitled to vote thereon, except holders of Housatonic bonds and Old Colony bonds. The holders of Housatonic bonds filed no objections to the order of confirmation and have taken no appeal therefrom.

not show that the proposed price was arrived at in the exercise of its independent judgment as to the value of Old Colony properties. The Old Colony provisions were referred back in order that it might exercise its independent judgment upon the record already made before it and such additional evidence, if any, as in its discretion it might wish to receive. Having declined to receive new evidence, we think the Commission was authorized to make findings as to value and price based on the old record without holding public hearings. As the court stated in Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 59 S.Ct. 301, 306, 83 L.Ed. 221:

"It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be supplied. * * * If findings are lacking which may properly be made upon the evidence already received, the court does not require the evidence to be reheard."

To such a situation the above-quoted provisions of subsections e and d do not, in our opinion, apply. In other words the remand of a part of a plan does not require the Commission to reopen the record as to the entire plan nor to take additional evidence if in the Commission's opinion the evidence already in the record is adequate for the correction of its error. See Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514–516, 64 S.Ct. 1129, 88 L.Ed. 1420; In re Chicago, M., St. P. & P. R. Co., 7 Cir., 145 F.2d 299, certiorari denied Park v. Group of Institutional Investors, 324 U.S. 857, 65 S.Ct. 860, 89 L.Ed. 1415.

**2.** The appellant further contends that there has never been a public hearing on the plan provisions as to Old Colony. This point was argued on the former appeal but was not passed upon and is still open.[4] The report of the Compromise Committee was before the Commission at the February 1942 hearings, but it contained nothing as to the price to be paid for Old Colony properties. The purchase price was first proposed in the Joint Report dated April 4, 1942. The February hearings had been closed except for reception of the Joint Report but provision was made for the filing of briefs after that Report should be received. Section 77, sub. d, permits plans to be filed "before, or with the consent of the Commission during, the hearings" and says that after the filing of such a plan the Commission shall, after due notice, hold public hearings. The appellant argues that the Joint Report plan was filed after the close of the February 1942 hearing. With this premise we cannot agree. It was filed *during* that hearing which remained open to receive it and allowed briefs to be filed thereafter in opposition to it. Since it was filed during the hearing, the public notice under which the February hearing was held should suffice; we do not construe subsection d to require a new notice every time a modification of the plan is proposed during the progress of a hearing thereon. Apparently no request was made by the appellant after the Joint Report was filed on April 4, 1942 to have the Commission take additional evidence relative to value and price of Old Colony assets. Only after the Commission's Third Supplemental Report and Order adopted the price proposed in the Joint Report did the present appellant feel aggrieved. The contention that no public hearing such as the statute requires was ever had with respect to the plan provisions as to Old Colony cannot be sustained.

**3.** The principal objection of the appellant is that the purchase price to be paid for the assets of Old Colony as provided in the plan certified by the Commission, and approved by the District Judge, is inequitable and unfair. The assets consist both of railroad properties and "non-operating" properties, the latter comprising four items: Stock of Union Freight Rail-

4 As we said in 150 F.2d 169, 170 of the Old Colony appeal, we "decided nothing respecting the provisions affecting Old Colony except that the Commission had not made independent findings of value and of price and the statute required that it should. Hence the Commission's new report will be subject to attack upon any legal ground when it comes before the district court."

road having a book value of $235,000; $3,600,000 (face) of New Haven first and refunding bonds; a claim against Bankers Trust Company for breach of covenants in the Old Colony lease assigned to it as trustee under New Haven's first and refunding mortgage; and a claim against New Haven, which had been liquidated by the district court in the sum of $47,186,963, arising out of repudiation of the lease by the principal debtor's trustees. In exchange for Old Colony assets New Haven is to release its prior lien claim against Old Colony amounting on December 31, 1943 to $6,081,048, to pay Terminal bond interest and reorganization expenses of Old Colony estimated at $4,413,796, and to deliver to Old Colony $4,398,305 (face) of new First and Refunding Bonds and $3,298,728 (face) of new Income Bonds. The Commission considered each of the assets and the evidence of record bearing upon its value and, without determining a definite value for each or an over-all valuation in dollars, found an equivalence in value between what Old Colony was to transfer to the reorganized New Haven and what it was to receive in exchange. Judge Hincks affirmed this equivalence by determining what he calls a "permissible valuation" for each of the items involved; and although his "permissive valuation" does not correspond with any finding in the Commission's Report, neither does it conflict with anything in the Report. In short, we cannot say that the Commission did not appraise the properties in the same manner as did the Judge; indeed, we cannot say anything about how it did appraise them, for the Report does not disclose its method. However, it is established by the Western Pacific case, Ecker v. Western Pac. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892, the Milwaukee case, Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, and the Denver & Rio Grande case Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., June 10, 1946, 66 S.Ct. 1282, 90 L.Ed. 1400, that valuations by the Commission need not be expressed in dollars nor broken down into items; they need be no

more than appraisals in equivalent securities of the reorganized debtor. And this is true although the assets appraised include "non-operating" property as well as "operating" railroad property.[5] The function of the court is only to see whether "the Commission had applied improper statutory standards."[6] Hence, if it is apparent that the Commission has conducted fair hearings, has given consideration to each element of value concerned in its over-all appraisal, and has not wrongly decided legal questions involved in the problems of valuation and of allotment of equivalent securities, we believe that the requirements of the statute are satisfied.

4. Even on the assumption that the law is as we have stated it, the appellant raises a number of objections to the Commission's appraisal. The first is that the finality of an appraisal by the Commission is limited to a true reorganization, that is, to one where the property for which the new securities are to be issued belongs to the debtor. Since in the case at bar the plan contemplates a sale of Old Colony assets to the reorganized New Haven, the appellant argues that the Commission could not lawfully proceed as it did, but must follow the doctrine applied in First Nat. Bank v. Flershem, 290 U.S. 504, 527, 54 S. Ct. 298, 307, 78 L.Ed. 465, 90 A.L.R. 391, under which "A detailed appraisal must * * * be made of the corporation's assets as of the date of the sale, based upon then values and the possibility of disposing of them in parcels, as well as an entirety." Again, "* * * a detailed valuation of the many items * * * was essential to intelligent bidding for the property in such parcels or as scrap." It is true that if the transfer of Old Colony assets is like a judicial sale on foreclosure or execution, the Commission's appraisal was not valid. But we think it is not. The purpose of the kind of appraisal required in the Flershem case is to protect those creditors who do not choose to come in; it is to provide an honest "upset price." The same procedure is not required under section 77, for the reason that if minority creditors are not content with the plan,

5 See 318 U.S. at page 500, 63 S.Ct. 692, 87 L.Ed. 892.

6 318 U.S. at page 473, 63 S.Ct. at page 707, 87 L.Ed. 892.

the court, under the "cram down" provisions added in 1935, 49 Stat. 919, can force them in; and if it does not, must reject the plan. Hence nothing should turn upon the fact that deeds of conveyance must be executed and exchanged for new securities, or that these transactions are described in terms appropriate to a sale. The "transfer" is as much a part of a true reorganization as if the title to the assets had been in New Haven. The statute itself so treats such a transaction, for section 77, sub. a, allows a subsidiary railroad corporation, such as Old Colony, to file a petition stating that "it desires to effect a reorganization in connection with, or as a part of the plan of reorganization of" the principal debtor. The plan now under consideration adopted the second alternative because the Commission determined that integration of the two railroads is required in the interests of the public. In such a situation we cannot understand how it can make the slightest difference, so far as concerns the appraisal of property, that there must be deeds to effect the transfer of the subsidiary's assets and that the new securities, the release of the principal debtor's prior lien claim against the subsidiary and the payment by the principal debtor of the subsidiary's reorganization expenses are treated as constituting the "price." We agree with appellees' argument that the properties of the Old Colony are, for purposes of the plan, on the same footing with respect to the whole system as are lines securing a divisional mortgage of New Haven. In the St. Paul case, 318 U.S. 523, 63 S.Ct. 727, 87 L. Ed. 959, it was held that bondholders whose claims were secured upon part of a single railroad—a division—were not entitled to a separate appraisal. Yet the transaction by which their lien was wiped out and they were given new securities is as much a "transfer" for a "price" and therefore a "sale" as is the proposed extinguishment of the lien of Old Colony bondholders in exchange for new securities.

Because section 77, sub. b (5), 11 U.S.C.A. § 205, sub. b (5), declares that a plan "shall provide adequate means for the execution of the plan, which may include * * * the sale of all or any part of the property of the debtor * * * at not less than a fair upset price," it is urged that the Commission was bound to set an upset price in dollars. But in our opinion the quoted provision is optional, not mandatory, as to any property which passes to the debtor or to the new reorganized company; indeed, there is some reason to suppose that it was interpolated in 1935 to provide against the possibility that the "cramdown" provision, also then introduced, might prove unconstitutional.

As we have said, the Commission's overall valuation was not expressed in terms of dollars. However, in analyzing the record as to values it tentatively assigned cash values to certain assets in order to make sure that New Haven's prior lien claims could be satisfied. It then considered Old Colony's railroad properties and determined what their capitalization might be on various hypotheses. By aggregating the values so assigned the appellant attempts to prove that the total value of the assets was greater by some $2,700,000 than the "price" to be received for them. Such a method of attack is not justified, for the values "assigned" by the Commission were but "tentative." As the Commission stated in concluding its discussion:

"The value of Old Colony properties and assets should not be determined solely by mathematical calculations since it is essentially a matter of judgment based upon a consideration of intangible as well as tangible elements and a general knowledge of system requirements."

The Commission's finding of equivalence in value between the assets to be transferred and the price to be paid can be upset by the court only if the Commission "applied improper legal standards."

5. The appellant urges that it did apply an improper legal standard with respect to the $3,600,000 of New Haven first and refunding bonds in that Old Colony was not credited with interest of $928,000 paid on these bonds into a special bank account and held subject to further orders of the court. The Report does not expressly mention this item of interest. Old Colony's right to it has never been adjudicated by the District Court, but for the purpose of testing the Commission's valuation of Old Colony as-

sets Judge Hincks assumed it to be an asset belonging to Old Colony and construed the Commission's Report to have treated it "as an unliquidated claim the proper value of which in its independent judgment was duly reflected in its comprehensive valuation of all Old Colony assets and as an asset which would pass to the New Haven upon the payment of the purchase price proposed for all Old Colony assets." He attributed the absence of discussion relating to the interest item not to oversight by the Commission but to absence of contention as to the existence and amount of the asset. We understand this to mean that he ruled that in treating the claim as an Old Colony asset worth $928,000 the Commission did not violate legal standards. The appellant, of course, agrees that legal standards were observed if the interest item was included in the Commission's over-all valuation, and argues that they were violated because it was not included. We think Judge Hincks was right in construing the Report to mean that it was included. It is not necessary for the Commission to show the precise method by which it reaches its over-all valuation. The objector to the valuation must show that "legal standards" were violated.

6. A somewhat similar objection is urged by the appellant with respect to Old Colony's claim against Bankers Trust Company. The Commission noted that the record shows that special counsel for Old Colony offered to compromise this suit for $4,000,000 and special counsel for the New Haven trustees recommended a compromise of $2,500,000, while certain of the secured creditors asserted that it had only a nuisance value. The Commission said that "For the purposes of this proceeding we will consider this claim as having a value of $3,250,000." Later, in considering the amount of Old Colony's claim of $47,186,-963 against New Haven for breach of lease, the Commission suggested that "if there be deducted from that the full recovery sought in the suit against the Bankers Trust Company ($13,379,215), the claim would be reduced to $33,807,748 * * *" The appellant does not object to using the compromise value, $3,250,000, of the claim against Bankers Trust Company as a setoff against the breach of lease claim

against New Haven, but strenuously protests against setting off the full ad damnum of the suit against Bankers Trust Company. In determining the compromise value of a claim, the Commission deals with a matter which is also within the province of the court. The validity of a claim presents a legal question which must necessarily be taken into account in determining its compromise value. If its validity were indisputable, we believe that the district judge could disapprove an inadequate compromise value as violating legal standards; conversely, if the claim were very doubtful, he could disapprove an excessive valuation. The opinion of Judge Hincks shows that he thought $3,250,000 a permissible compromise value for the claim against Bankers Trust Company; and the appellant does not controvert this. How much should be deducted as a setoff against the breach of lease claim is primarily a question of fact depending upon what the parties agreed to in the supposititious settlement. Whether their agreement produced a settlement so unreasonable as to require judicial disapproval would also, we assume, be a matter within the province of the court. Judge Hincks' opinion expressed the view that it is "perfectly obvious as a matter of law" that if the claim were liquidated in the amount of $3,250,000, the breach of lease claim should be reduced by only the same amount. He did not read the Report as predicating the Commission's comprehensive valuation upon a process whereby the value of the unsecured breach of lease claim was reduced by the ad damnum of the Bankers Trust suit. The Commission merely considered the possibility of deducting the full ad damnum, it did not say that it did value the breach of lease claim on that basis. The Third Supplemental Report of October 6, 1942 referred to the suggestion that $3,250,000 would be a fair compromise value of the suit and "that Old Colony's unsecured lease claim should be reduced only by the latter amount." Judge Hincks was of opinion that when the Commission had thus stated the correct basis of setoff, its recital in the Sixth Report in hypothetical form of the extreme claim of certain New Haven parties did not justify the inference that the Commis-

sion's valuation was based upon the adoption of such contention. We agree.

**7.** The appellant objects also to taking December 31, 1943 as the cut-off date, since it is now apparent that the plan will not be consummated until years later. When the Commission initially proposed this cut-off date it was in futuro. When it appeared from the trustees' annual reports that estimates of Old Colony earnings up to that date were inaccurate, the Commission made corrections to conform to actualities. Because of the unexpectedly long delay in consummating the plan we see no reason for the Commission to postpone the cut-off date. As a practical matter some closing time must be set and it cannot be progressively postponed without reopening the issues and making new findings, with resulting new appeals. By the time these are finished conditions may again have changed, and so on ad infinitum. See Interstate Commerce Comm. v. Jersey City, supra. Indeed, if the closing date were to be advanced to 1946 or 1947 the change would probably be detrimental rather than beneficial to the appellant, for the court may take judicial notice that war earnings have ended and costs of labor and materials have advanced.

**8.** It is urged that the order of confirmation is erroneous because the plan was submitted to vote prematurely. The vote was taken while the prior appeal was pending from the order of December 8, 1944. Subdivision e of section 77 provides that after the judge has approved the plan, he shall certify his opinion and order to the Commission. "The plan shall then be submitted by the Commission to the creditors * * * for acceptance or rejection, within such time as the Commission shall specify, * * *." We find nothing in the statute to suggest that the plan may not be submitted for vote pending an appeal from the order of approval. Nor do we see any good reason why this should not be done, thereby saving time if the order of approval is affirmed. Although the order was reversed on the appeal of Old Colony interests because of a formal defect which the Commission's Sixth Report has cured, it would be a useless formality to submit the plan again to those creditors who have already voted in favor of it. It is urged that the plan, when submitted, was invalid as to Old Colony bondholders, and must therefore be resubmitted at least to them. This technically logical argument would have more persuasive force if acceptance by Old Colony bondholders were requisite for confirmation of the plan. But section 77, sub. e, permits confirmation even though certain creditors have rejected it if the judge finds that the statutory conditions are met. Judge Hincks found that they were. Hence resubmission to the bondholders would be futile. If they voted favorably, confirmation would follow mandatorily; if they again rejected it (as appellant says they would) discretionary confirmation would follow. So the only question of importance is whether the judge's findings (a) as to fair and equitable treatment, (b) unreasonable rejection, and (c) conformity with clauses (1) to (3) of the first paragraph of subsection e are warranted. In sustaining the order of approval we have already passed on conditions (a) and (c). It is urged that it cannot have been unreasonable for the bondholders to reject a plan which did not represent the Commission's independent judgment, as this court subsequently held the plan did not. But there is little reason to suppose that this formal defect in the plan was the basis for the negative vote of the dissenters, rather than their belief that the plan provided unfair treatment. In the Denver & Rio Grande case, supra, 66 S.Ct. at page 1303, the court says that "If a plan gives fair and equitable treatment to dissenters, the elements which make the plan fair and equitable cannot be the basis for a reasonably justified rejection." Since Judge Hincks has found the plan fair and equitable, a resubmission followed by a second rejection would accomplish nothing.

## II. Appeal of Boston Terminal Bondholders.

These appellants are the trustee under the Terminal Company's mortgage and two groups of holders of its mortgage bonds. In so far as their appeals question the

procedure adopted by the Commission and the district court subsequent to the former appeal, no further discussion is needed. The principal questions presented by their appeals are whether the bondholders are unsecured creditors of the New Haven, whether the plan makes provision for them as such, whether their claim has been allowed, and whether they must be given an opportunity to vote upon the plan before it can be confirmed.

**1.** The Boston Terminal Company is a Massachusetts corporation created by special act, Acts of 1896, c. 516, for the purpose of providing a union terminal for five specifically named railroads, among which are the New Haven and the Old Colony. The Massachusetts statute imposed upon the five railroads three distinct obligations: (1) To use the terminal (Section 9 of the Act); (2) to pay the Terminal Company's operating cost, (mostly bond interest and taxes), each railroad paying in proportion to its own use (Section 10); and (3) to pay any deficiency established upon foreclosure of the mortgage securing the Terminal Company's bonds, each railroad paying in such proportion as the Supreme Judicial Court of Massachusetts shall determine (Section 4). The obligation for operating expenses runs directly to the Terminal Company, for whom a trustee in reorganization has been appointed by the bankruptcy court in Massachusetts, but the obligation for any deficiency on foreclosure runs to the bondholders or their mortgage trustee.

Upon the prior appeal, these appellants took the position that the bankruptcy court had no power to discharge New Haven or Old Colony of their statutory obligations under the Massachusetts Act of 1896; hence they contended they were not creditors. We rejected the contention that the statutory obligations could not be modified.[7] Consequently, for purposes of the present appeal, the appellants claim to be creditors of New Haven and Old Colony by reason of the contingent obligation of each to make payment in such sums as the Massachusetts Supreme Court may determine in the event that a deficiency is established by foreclosure of the Terminal mortgage. This statutory contingent obligation the plan proposes to abrogate. Although their claim is contingent and unliquidated, we think it plain that they are creditors within the statutory definitions.[8] Indeed, the appellees do not dispute this, but contend only that the claim is not presently provable.

The Terminal Company is also a creditor of New Haven and of Old Colony based on their statutory obligations to pay proportionate shares of its operating expenses. Strictly, this question may not be before us because its reorganization trustee has not appealed; but consideration of its right seems proper, since the amount of the bondholders' deficiency claims will be materially affected by enforcement of the right of the Terminal Company to collect part of its operating expenses from New Haven and Old Colony.

**2.** Article N 1(a) of the plan, which is set out in the margin,[9] provides that the charters of the reorganized company (New Haven) and Old Colony shall

---

7 See 147 F.2d 40, 52, certiorari denied Commonwealth of Massachusetts v. New York, N. H. & H. R. Co., 325 U.S. 884, 65 S.Ct. 1577, 89 L.Ed. 1999.

8 11 U.S.C.A. § 205, sub. b; 11 U.S. C.A. § 103, sub. a(8).

9 N. The reorganized company shall acquire as a part of its reorganization all of the properties, franchises, and assets of the Old Colony except those of the Old Colony's Boston group (those covered in Finance Docket No. 12614) upon the terms and conditions as follows:

1(a) The charter of the reorganized company and of Old Colony shall be amended, and the franchises and statu-
tory obligations of the reorganized company and of Old Colony (including any charter, franchises, and statutory obligations acquired by the reorganized company in connection with the acquisition of the properties, assets, and franchises of any other railroad, and as operator of the Boston group) shall be amended or superseded so that (1) the reorganized company and Old Colony will be relieved of any obligation to continue to use the property of the Boston Terminal Company, and of any obligation to make any payments for such use if and when such use shall be discontinued; (2) the obligation of the reorganized company and Old Colony and their trustees to ·

be amended so as to release them from the obligation to use the terminal, to reduce retroactively to October 30, 1939,[10] the annual compensation to be paid for such use subsequent to that date to a proportionate percentage of $275,000, and to abrogate the obligation to pay any deficiency on foreclosure of the bond issue. Since the bondholders and Terminal's reorganization trustee are unsecured creditors whose rights the plan proposes thus to modify, provision must be made to take care of their claims. See Kuchner v. Irving Trust Co., 299 U.S. 445, 453, 57 S.Ct. 298, 81 L.Ed. 340. Article N 1(b)[11] plainly does so with respect to the claim of Terminal's reorganization trustee. It provides that he shall have the right to elect whether to exclude the bankrupt railroads from further use of the Terminal Company's property and "file a claim for damages in these proceedings" or to accept the terms proposed in the plan for continued use by such railroads "and thereby waive all claim of damages arising from the rejection and all claims for compensation for the use of its property other than such compensation as is provided by the plan." We understand this to mean that acceptance by Terminal's trustee will release New Haven and Old Colony not only from any claim for damages but also from any administration claim for use and occupation during reorganization in excess of their proportion of the $275,000 annual compensation. These provisions appear to provide adequately for the claims of the trustee. If he rejects the offered terms, he

make payments on account of interest and principal (at maturity or otherwise, including any deficiency on foreclosure or any other claim with respect thereto) of the debt of the Boston Terminal Company represented by its presently outstanding bonds (or any extensions, renewals or refunding thereof) after the date on which the trustees have made the last payments on account of interest on said bonds, shall, so long as the reorganized company (for itself or as operator of the Boston group) shall use the property of the Boston Terminal Company, be satisfied by payment by the reorganized company of an amount per annum (and at that rate for any period of less than a year) obtained by applying to $275,000 the percentage of the total use of such property from time to time by the principal debtor (including in such percentage prior to the consummation of the plan use by its trustees for itself and as operators of Old Colony and thereafter use by itself and as operator of the Boston group); and (3) the obligation to pay operating expenses shall be limited to the amount of such expenses after deducting all revenues from rentals and concessions; provided, however, that, if the number of passengers using the South Station of the Boston Terminal Company shall substantially increase in the future, this Commission will consider an application by any bondholder of the Terminal Company to make an equitable revision of the amount payable by the reorganized company.

(b) The trustee in bankruptcy of the Boston Terminal Company or any receiver in equity which may hereafter be appointed by any court of competent jurisdiction to manage the property and affairs of such corporation shall have the right to elect whether he will exclude the using bankrupt railroads from further occupation and use of the property of the Boston Terminal Company and file a proof of claim for damages in these proceedings, or will accept the terms proposed in the plan for the continued occupation and use of such property by such railroads and thereby waive all claim of damages arising from the rejection and all claims for compensation for the use of its property other than such compensation as is provided by the plan, such election to be exercised upon the submission to him by this Commission of the plan for acceptance or rejection under section 77, sub. e, of the Bankruptcy Act and within such time thereafter as this Commission in its order of submission shall fix; provided, however, that if such trustee or any successor-receiver shall not exercise his election by rejecting the plan within the time thus limited, and shall not file a claim for damages herein within the 2 weeks next succeeding, then such trustee, his successor-receiver, the Boston Terminal Company and its creditors and stockholders shall, each and every one of them, be barred from participating as a creditor or creditors in these proceedings, or from prosecuting any claim for damages against the estate of the using bankrupt railroads.

[10] October 30, 1939, is the date on which the reorganization trustees made their last payments on account of Terminal's operating expenses.

[11] See note 9 supra.

may claim damages as an unsecured creditor and under Article J(17) of the plan will be entitled to receive common stock for his claim against New Haven; he will also have an administrative claim for use and occupation against the reorganization trustees of New Haven and Old Colony. If he accepts the offered terms, he will voluntarily relinquish these claims and accept in substitution therefor the reduced compensation which Article N 1(a) offers.

■ The parties are not in accord as to whether acceptance by Terminal's trustee is intended to operate as a release of the bondholders' claim for damages based on abrogation of the deficiency obligation in the event of foreclosure of the bond issue. The final clause of Article N 1(b) provides that if Terminal's trustee shall exercise his election by rejecting the plan and shall not file a claim for damages within the two weeks next succeeding, "then such trustee, his successor-receiver, the Boston Terminal Company and its creditors and stockholders shall, each and every one of them, be barred from participating as a creditor or creditors in these proceedings, or from prosecuting any claim for damages against the estate of the using bankrupt railroads." The appellants assert that, since they are creditors of Terminal, the quoted provision means that its trustee by accepting the plan can extinguish their right to damages against New Haven and Old Colony. Obviously that would be unlawful and the appellees so admit, at least by implication. They assert, however, that "The plan does not purport to affect the rights of the bondholders arising out of any deficiency which may be established through foreclosure of the Terminal Mortgage" and "if such a claim is finally determined," Article J(17) which reserves common stock for unsecured creditors, "is adequate to compensate for it." Only if the district judge accepts the appellees' concession as to the meaning of the plan can his order approving it be sustained. Article R provides that "The construction of the plan by the court shall be final and conclusive," and that the court shall have "power to cure any defect" therein. We find nothing in Judge Hincks' opinions to indicate that he has construed the plan differently from what we hold necessary for its validity, namely, that the trustee's acceptance of the offer can have no effect upon the bondholders' claim for damages arising out of repudiation of the deficiency obligation under section 4 of the Act of 1896. On the assumption that consummation of the plan will be carried out in conformity with these views, we think it unnecessary to remand the cause in order that the district judge may make an explicit ruling that the plan does mean what we hold it must mean to be valid.

■ The bondholders further argue that the plan is inequitable because it fails to provide for payment of their deficiency claim against Old Colony. Under Article N 4 substantially all the assets of Old Colony are to be transferred to the recognized New Haven and the new securities which pay for them are to be issued and delivered to Old Colony's bondholders. Thus Old Colony will have no assets with which to satisfy any deficiency judgment the Terminal bondholders may obtain against it, and the plan does not require the reorganized New Haven to assume this obligation of Old Colony. However, there is nothing inequitable in this result. Old Colony is insolvent; hence its unsecured creditors are entitled to nothing until its bondholders have been paid in full. The new securities which Old Colony bondholders are to receive do not equal the face value of their bonds.

The parties are also not in accord as to what, if the offer to the Terminal Company be rejected by its trustee, the plan provides with respect to the administration claim for use of its property by the reorganization trustees during these proceedings. The appellants assert that Article N 1(a) puts a "ceiling" upon the amount of such claim, limiting it to the proportionate percentage of the $275,000 annual compensation. The appellees answer that both Judge Hincks and this court have held the contrary. This is correct. See 54 F.Supp. at page 625; ibid. at page 638; 147 F.2d at page 51. The argument that the proposed amendments to the charter of the reorganized company would make any greater payment ultra vires is not sound. Such charter limitations will not affect administration claims against the

reorganization trustees. Payment of such claims is required by the statute, 11 U.S.C.A. § 102, sub. a, § 205, sub. *l.* Article L of the plan provides that priority claims, except those against Old Colony, "shall be paid in cash or assumed by the reorganized company with the same relative priority as they now have with respect to the other obligations of such debtors." And Article N 4 states that the reorganized company shall "assume and pay * * * (c) current liabilities and obligations of Old Colony trustees incurred during the reorganization proceeding." Thus the administration claim is properly cared for.

■ 3. The appellants contend that Order No. 45, together with subsequent proceedings in this cause, constitute a sufficient allowance of their claim to entitle them to vote upon the plan. The New Haven's petition, upon which Order No. 45 was entered, alleged that the principal amount of Terminal bonds outstanding was $15,155,000, and stated that the "Debtor, together with other railroad companies, is liable to pay any deficiency following foreclosure of the mortgage securing said Bonds." The order provides that the debtor's petition shall constitute a sufficient filing or evidencing of said claims but that nothing contained in the order shall constitute a determination of the nature or extent of the debtor's liability or constitute the allowance by the court of any claim against the debtor. Paragraph 6 of the order granted any party in interest upon leave of court the right to "protest" any claim within sixty days, concluding with the sentence:

"In the absence of protest the aggregate amount of the bonds or other securities outstanding shall be considered as prima facie correct for the purposes of these proceedings."

This order, coupled with the fact that no protest was ever filed and that the plan recognizes the existence of the bondholders' claims by undertaking to deal with them,

should, the appellants argue, serve as an effective "allowance." See Hammer v. Tuffy, 2 Cir., 145 F.2d 447, 450; In re Jayrose Millinery Co., 2 Cir., 93 F.2d 471, 475; In re Two Rivers Woodenware Co., 7 Cir., 199 F. 877. There would be force in this argument were not the bondholders' claims contingent on foreclosure and unliquidated in amount. The obligation running to the bondholders under section 4 of the 1896 Act is not a guaranty of the bonds; it is only an indemnity obligation to make good any deficiency upon a foreclosure of the mortgage securing them. Moreover, after the deficiency is ascertained it has to be apportioned between the several railroad obligors by the Supreme Judicial Court of Massachusetts. The appellants concede that the bankruptcy court has no power to foreclose the mortgage or to apportion any deficiency which may be established by foreclosure in Massachusetts. We are at a loss to understand upon what theory it can be supposed that the bankruptcy court has "allowed" the claim, when it is without power to determine the amount of it.

■ 4. But we see no reason why a plan of reorganization cannot lawfully make provision for an unliquidated claim, or why, if such provision is adequate, the court cannot approve the plan before the liquidation and allowance of the claim. See In re Akron, Canton & Youngstown R. Co., 6 Cir., 117 F.2d 961, 964. Section 77, sub. c(7), 11 U.S.C.A. § 205, sub. c(7),[12] seems to recognize that a creditor who has filed his claim may participate in the reorganization, subject to the later allowance of his claim. Article J(17) provides that the court shall reserve enough of the new common stock to allow equal proportionate distribution to any unsecured creditors whose claims "at the time of consummation" are "not then liquidated." Since the amount of common stock which the reorganized company is authorized to issue is of neces-

---

[12] "(7) The judge shall promptly determine and fix a reasonable time within which the claims of creditors may be filed or evidenced and after which no claim not so filed or evidenced may participate except on order for cause shown, the manner in which such claims may be filed or evidenced and allowed, and for the purposes of the plan and its acceptance, after notice and hearing, the division of creditors and stockholders into classes according to the nature of their respective claims and interests. * * *"

sity limited, no other way exists but to give to each unsecured creditor his proportionate number of shares determined by the fraction which his claim, when liquidated, bears to the whole amount of liquidated claims. The Article presupposes that the reserved shares will be more than enough to meet the liquidated value of the claims, and provides that "any excess so reserved" shall be sold and the proceeds distributed among the holders of the new common stock, thus effecting a perfect equality of distribution.

5. There remains the question whether the Terminal bondholders must be given an opportunity to vote upon the plan before it can be confirmed. Section 77, sub. e, 11 U.S.C.A. § 205, sub. e, provides that the plan, after approval, shall be submitted for acceptance or rejection to creditors "whose claims have been filed and allowed." Since the appellants' claim had not been allowed, the district court had only two alternatives—either to exclude the bondholders from any vote at all, or to postpone confirmation of the plan until their claim should be liquidated and allowed. It chose the former alternative. We think this was permissible under the Act. Section 77, sub. l, 11 U.S.C.A. § 205, sub. l, provides that

"In proceedings under this section and consistent with the provisions thereof * * * the rights and liabilities of creditors * * * shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed."

In "straight" bankruptcy the right to vote is limited to creditors "whose claims have been allowed." 11 U.S.C.A. § 93, sub. a. Among debts which "may be approved and allowed," are included "contingent debts and contingent contractual liabilities," 11 U.S.C.A. § 103, sub: a(8), and "claims for anticipatory breach of contracts, executory in whole or in part, including unexpired leases of real or personal property." 11 U.S.C.A. § 103, sub. a(9). Similarly broad definitions are contained in the section dealing with the reorganization of railroads, section 77, sub. b, 11 U.S.C.A. § 205, sub. b, defining "claims" to include "debts, whether liquidated or unliquidated," and "creditors" to include "all holders of claims of whatever character * * * whether or not such claims would otherwise constitute provable claims under this Act. * * *" But the proviso added to section 57, sub. d in 1938, 11 U.S.C.A. § 93, sub. d, states

"That an unliquidated or contingent claim * * * shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this title."

This procedural section regulating the rights of creditors in "straight" bankruptcy is made applicable to railroad reorganization by section 77, sub. l, 11 U.S.C.A. § 205, sub. l, since it is not inconsistent with the provisions of section 77.

To ascertain the deficiency for which New Haven is liable to Terminal bondholders will certainly unduly delay confirmation of the plan, but it will not unduly delay payment to the bondholders out of the reserve of common stock held under Article J(17) of the plan. Are we to say that liquidation of their claims, which will not unduly delay the final step in administration—distribution of the new securities—must cause the postponement of an earlier step, like voting, until the claims are liquidated? That would be unreasonable, for it would subject all the other creditors to that kind of delay which the proviso to § 57, sub. d, was meant to avoid. We think that the correct construction of the statute is to say that a creditor whose claim cannot be liquidated or otherwise "estimated" without unreasonably delaying a given step in the administration of the debtor's estate, may not share in that step; but if his claim can be liquidated or "estimated" without unreasonably delaying a later step he is to be allowed to share in that step. As in many cases, the court must choose between a more complete justice to part of those involved and an indefinite delay detrimental to the whole group. The reorganization procedure was devised in the interest of expedition, Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & P. Ry., 294 U.S. 648, 685, 55 S.Ct. 595, 79 L.Ed. 1110, although experience often shows, unfortunately, that it fails to accomplish that

purpose. It is true that Judge Hincks did not expressly decide that it would unduly delay confirmation to have it wait upon ascertaining the amount of the deficiency claim of the bondholders. But to remand the cause for such a finding is unnecessary, for it is perfectly clear that such ascertainment would unduly delay confirmation. A decision otherwise we should consider an abuse of discretion.

The appellants argue that on the prior appeal we held that "The plan enables New Haven to reject what in effect amounts to a burdensome lease," 147 F.2d at page 52; that the last paragraph of § 77, sub. b, 11 U.S.C.A. § 205, sub. b, provides that if an unexpired lease "shall be rejected by any plan," any person injured by such rejection "shall for all purposes of this section be deemed to be a creditor of the debtor to the extent of the actual damage or injury determined in accordance with principles obtaining in equity proceedings"; hence, they say, their right to vote upon the plan cannot be defeated. Our reference to the rejection of a burdensome lease was only by way of analogy; but even if the analogy were perfect the above quoted provisions of § 77, sub. b, do not provide what are the rights of the lessor when the extent of his actual damage cannot be determined in accordance with principles obtaining in equity proceedings, but must, as here, be determined by a special tribunal—the Supreme Judicial Court of Massachusetts. In such a case, for reasons already stated, we think § 57, sub. d, 11 U.S.C.A. § 93, sub. d, prescribes the procedure. Accordingly we hold that the bondholders were not entitled to vote upon the plan and that the order of confirmation was not premature.

### III. Appeal of the Commonwealth of Massachusetts.

The contentions raised by this appellant require no separate discussion. They either repeat objections which we overruled on the prior appeal, 147 F.2d 40, 51, certiorari denied 325 U.S. 884, 65 S.Ct. 1577, 89 L.Ed. 1999, or make common cause with the other appellants with respect to matters dealt with in our discussion of their appeals.

The orders appealed from are affirmed.

L. HAND, Circuit Judge (concurring).

I agree with my brother Swan's opinion, and accept it as my own with one exception, and that leads me to the same result, though by a slightly different course. Under the decisions of the Supreme Court the Commission may appraise all the property of a railroad—"operating" and "non-operating" —at a bulk sum; more than that, it may fix the price to be paid by an award in new securities, without translating into dollars either the value of the property transferred, or the value of the new securities acquired. In fixing such a bulk sum, not only is the Commission not confined to "operating" properties, but in appraising "non-operating" properties it may value the debtor's claims against third persons, even when that involves the validity and amount of the claims, and when it depends upon questions of law, to which the Commission's specialized skill and experience do not extend. It so happens, however, in the case at bar that Old Colony's "non-operating" property, on which controversy has chiefly arisen is of an unusual kind. It is made up of four items: (1) The Union Freight shares; (2) the claim against the Bankers Trust Company; (3) the interest upon the Refunding Fours; (4) the claim for New Haven's repudiating the lease. I lay aside the first of these at once; it is not in dispute and the Commission's appraisal of it would be final anyway. The second would be merely a claim against a third person, except that the mortgage which secured the Refunding Bonds provided that, if the mortgage trustee became liable as such, whatever it had to pay should be added to the mortgage debt. Hence the claim against it was really a prior claim against New Haven; and so too of course is the interest on the bonds themselves. The last item is whether the credit to be allowed upon the claim for breach of the lease, shall be the amount of the settlement, or the face of the claim which it settles. Thus it appears that these three items are claims against New Haven, as well as assets of Old Colony. Subdivision c (7) of § 77 provides among other things that "the judge shall promptly determine and fix * * * the manner in which * * * claims may be filed or evidenced and allowed," and § 77, sub. c,

provides that only "allowed" claims shall share, or vote. I cannot divorce the three items here in controversy, in their aspect as assets of Old Colony, from their aspect as claims against New Haven, and in that aspect Hincks, J., had exclusive jurisdiction to determine their validity and amount; although only the Commission might set their value, when so liquidated, in terms of new securities.

I understand my brother Swan does not dissent so far; he and I differ only because he thinks it enough that the Sixth Supplemental Report does not show that the Commission in appraising the property in bulk did not take as the value of any of the three items a figure other than that at which Hincks, J., "allowed" them, or was content that they should be "allowed." It is here that I cannot agree; I cannot understand why the Commission's appraisal of all the assets in a hotchpot that includes the claims, will suffice, merely because the bulk sum is "permissible"—in the language of Hincks, J.—at whatever face amount the Commission may have liquidated the claims. The problem is of two possible variables over only one of which the Commission had power; and the fact that, if it decided wrongly as to the one that was beyond its powers, it might lawfully have compensated for its error by assigning a higher appraisal to the other, is to my mind irrelevant. It could become relevant only in case we might properly substitute for the actual appraisal of the other property, which the Commission made, and which it had power to make, an appraisal which it might have made, but did not. All parties are entitled to be judged by the value at which the Commission actually appraised what it had power to appraise, and by what the court would "allow" as the face of the claims. It must be possible somewhere in the record to learn at what amounts the Commission did take the face of the claims, before we can know whether it remained within its jurisdiction; the possibility that it did so, is not enough.

Nevertheless, in spite of this formal inadequacy, I think that there is enough in the record to affirm the order, though I must own that I should have welcomed a clearer declaration in the report. The first of the items is the amount allowed for

settlement of the claim against the Bankers Trust Company. I do not think that Hincks, J., had power to "allow" that claim at a figure half way between the offers of New Haven and Old Colony. When a claimant and the debtor agree upon a compromise, the bankruptcy judge may no doubt "allow" the claim at that figure, if he thinks it fair; but I know of no power by which he may cut the Gordian knot and force each party to accept a middle figure of his own choosing. However, in the case at bar we can avoid that difficulty, because neither New Haven nor the Old Colony bondholders object to the settlement figure—$3,250,000— which incidentally is one of the few details, if not the only one on which the Commission has seen fit to commit itself. Therefore, the only question is whether we can learn what was the credit which the Commission deducted from the lease claim because of the settlement. As to that the Sixth Report is entirely silent, no doubt because the Commission supposed that the appraisal of the lease claim lay as much within its powers as that of any other asset. As my brother Swan says, the question is really of the terms of the settlement of the Bankers Trust Company claim itself; and these might, so far as I can see, have been of three kinds. The settlement might (1) extinguish merely the claim against the Bankers Trust Company, leaving the whole lease claim undiminished; (2) it might in addition extinguish the lease claim by the amount of the settlement; (3) it might extinguish the lease claim by the whole face of the claim against the Bankers Trust Company. I cannot see that any of these is inherently more probable than another; but I think that we have evidence that the Commission assumed that the settlement presupposed the second. The proposal first appears in the Third Supplemental Report of the Commission, where it is clear that the negotiations were of the second kind; and it is to the last degree unlikely that the Commission, starting with that understanding, should have in fact assumed that they shifted to either of the other two. It is true that in one passage in the Sixth Report the Commission mentioned the possibility that the settlement might reduce the lease claim by the full amount of the claim

against the Bankers Trust Company; but that, like almost everything else in the report, was merely a discussion of one of the various hypotheses, which might justify the final result, and must not be taken as evidence that the Commission in fact was reading the negotiations as having changed to the third kind. For these reasons I think we are entitled to say that the lease claim was appraised at the amount at which Hincks, J., was willing to "allow" it.

The last is the item of interest on the Refunding Fours held by Old Colony. Hincks, J., had never decided whether the bank deposit was due to Old Colony, and indeed in his opinion he suggests a doubt about it. Since, however, New Haven does not dispute Old Colony's right to it, the only question is whether there is satisfactory evidence that the Commission included it. The Sixth Report leaves the question open; but the First Report treated interest from June 2, 1936 as part of Old Colony's claim, the bank deposit not yet being in existence. However, it had been created before the Third Report was filed, in the appendix to which, as in those to the Fourth and Fifth Reports, it was treated as a credit to be deducted from the interest due upon the bonds. This appears to me a particularly telling bit of evidence that, regardless of what Hincks, J., may have intended by keeping the bank deposit as a sort of "suspense" item, at least the Commission had several times allocated it unconditionally to Old Colony, since otherwise it would not have reduced the interest charge. Again, as in the case of the lease claim, it would be highly unreasonable to assume that, when it came to the Sixth Report, the Commission changed its mind.

I regret that in the form which the case comes before us, we should have to spell out the actual decision by such roundabout methods, when it would have indeed been possible to make our path easy by categorical findings. However, since, for the reasons I have tried to give, it appears to me that the Commission kept within the limit of its jurisdiction, I conceive that we have no reason for further prolonging a litigation which, as everybody agrees, has already far exceeded expectation, and which makes sadly ironical the hope that a re-organization under § 77 will necessarily be speedier than such reorganizations used to be. Nor can I think, because the Commission in the Sixth Report has come out with an appraisal of the Old Colony property at exactly the same figure as it did in the Fifth, that we should be justified in imputing to it any evasion of its duty. Indeed, in our last decisions we particularly declared that all we wished to be assured of was that the compromise had not been accepted without independent valuation, and we expressly said that it might turn out that no change in the award would prove necessary.

FRANK, Circuit Judge (dissenting in part).

My dissent relates solely to my colleagues' opinion concerning the method of fixing the price of the Old Colony property, as to which I disagree on two alternative grounds.

## I.

*The Plan, as to Old Colony, is based on a "sale * * * of the property." Such a Plan is governed by § 77, sub. b(5), which requires the fixing of a "fair upset price."*

Briefly stated, my first ground is as follows: Under § 77, sub. a, the Commission could have formulated a Plan for the reorganization of Old Colony either (1) "in connection with" or (2) "as a part of the reorganization" of the New Haven. For reasons I shall state later, I think the Commission clearly elected the first method. Having done so, it could have devised a "recapitalization" Plan for Old Colony. Instead, the Plan provides—as up to now everyone has agreed—for an Old Colony reorganization through a "sale" of the Old Colony property and the distribution of the proceeds among the Old Colony bondholders. Section 77, sub. b(5), authorizes that type of "sale" reorganization, but only *"at not less than a fair upset price."* In affirming the order approving the Plan, my colleagues, in effect, have read that subsection out of the Act. In order to make plain why I regard as erroneous such a judicial amendment of the statute, I must first note some pertinent facts.

1. On October 23, 1935, the New Haven went into bankruptcy reorganization in the

United States District Court of Connecticut. As the New Haven had been running the Old Colony lines under a 99-year lease from Old Colony, the New Haven trustees in bankruptcy continued to do so, as part of their operation of the New Haven system. However, after some seven months, the trustees, on June 2, 1936, disaffirmed the lease. The result was that, although pursuant to § 77, sub. c(6), the trustees were obliged to operate the Old Colony lines in the public interest, that operation, as the Supreme Court held,[1] was "involuntary," being, as subsection c(6) says, entirely "for the account of" Old Colony. The consequence has been that, for the deficits resulting from that operation, the New Haven system is a creditor of Old Colony, with a "prior lien claim" on its assets in the amount of some $10,500,000. In other words, on June 2, 1936, by the deliberate and valid action of the New Haven trustees, Old Colony was wholly divorced from, and became a stranger to, the system operations of the New Haven; that status has maintained for some ten years and up to the present moment.

Not until June 3, 1936, the day after that divorce occurred, did the officers of Old Colony file a petition for its reorganization. Because the New Haven owned a majority of Old Colony's voting stock, this petition was lawfully filed, pursuant to § 77, sub. a, in the United States District Court in Connecticut, where the New Haven trusteeship was pending. The Old Colony petition, in accordance with that subsection, stated that Old Colony "desires to effect a reorganization in connection with or as a part of the plan of reorganization" of the New Haven.

2. Section 77, sub. a, reads in the alternative: The reorganization of such a subsidiary may be either (a) "in connection with" or (b) "as a part of" the reorganization of the parent. Consequently, the Commission was authorized to devise a reorganization Plan for the Old Colony on one of these bases, i. e., either (a) "in connection with" or (b) as "part of" the reorganization of the New Haven system.

3. Had the Commission proceeded according to the second alternative, the Old Colony Plan would have been written as if the severance of Old Colony from the New Haven system operations had never happened, i. e., as if, during the entire eleven years of trusteeship and until now, Old Colony's operations had been conducted as were those of the New Haven "divisions," and not for the "account of" Old Colony. In other words, such a Plan would have ignored the "prior lien" creditor claim of New Haven against Old Colony, and the Old Colony bonds would have been allotted, in new New Haven securities, the "value" of the Old Colony assets—without a deduction of some $10,500,000 representing the deficit operations of the Old Colony during the trusteeship. As to such a Plan, the doctrine of the Milwaukee case, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 [2] (and related cases [3]) would have applied.

4. But the Commission did not construct its proposed Plan on that basis. It chose, instead, to propose (a) a plan for the New Haven, and simultaneously, (b) a plan for Old Colony "in connection with" the New Haven Plan: (a) The Old Colony Plan expressly calls for a "sale * * * of [its] property," as authorized by § 77, sub. b(5); (b) The New Haven Plan expressly includes, among other things, a provision for the "purchase" or "acquisition" of the Old Colony property thus to be sold. Under that scheme, it was entirely proper to provide, as the Commission did, that Old Colony was to pay the "prior lien" claim, through the deduction of the amount of that lien from the "price" New Haven is to pay for the Old Colony assets. But such a Plan, grounded upon a sale, must meet all the requirements of subsection b(5).

5. I refer to that subsection because there, and nowhere else in § 77, does Congress authorize a reorganization by a "sale * * * of the property" of a debtor and

---

[1] Palmer v. Webster & Atlas National Bank, 312 U.S. 156, 167, 61 S.Ct. 542, 85 L.Ed. 642.

[2] My colleagues refer to it as the St. Paul case.

[3] Ecker v. Western Pacific R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892; Reconstruction Finance Corp. v. Denver & Rio Grande Western R. Co., June 10, 1946, 66 S.Ct. 1282.

"the distribution of * * * the proceeds derived from the sale * * * among those having an interest therein." Such a reorganization must, then, comply with that subsection. It expressly provides, without exception, for such a sale at "not less than a fair upset price." [4]

6. My colleagues have disregarded § 77, sub. b(5), because, they say, it has no application where there is a sale from a subsidiary in reorganization to the principal debtor as "part of the * * * plan of reorganization" of the principal debtor; in such a case, they suggest, the "cram down" provision dispenses with the need of an upset price.

7. With that reasoning I would agree were the reorganization of Old Colony a part of the New Haven system reorganization. But where the sale to the parent is not "[a] part of" the parent's system reorganization, but merely "in connection with" it, the sale is no less within sub. b(5) because the property of the subsidiary is sold to the parent. (My colleagues do not suggest, nor could they reasonably, that the word "debtor" in sub. b(5) does not include a subsidiary reorganized in "connection with" the reorganization of its parent.) And I think that the following analysis shows that my colleagues err in the way in which they reason to the conclusion that this is a "part of" type of reorganization:

They recognize that subsection a authorizes alternative methods (i. e., "in connection with" or "as a part of"). But they say that the Commission "adopted the second alternative because" it "determined that integration of the two railroads is required in the interests of the public." That seems to me a non-sequitur. Unquestionably, the Commission decided that it is in the public interest that the Old Colony properties become part of the reorganized New Haven system. But that decision did not constitute a choice of the "second alternative"; it left the Commission in a position to choose either alternative. That it selected the first appears from the nature of the Plan as to Old Colony. For, to repeat, had it selected the second, it would have restored the status quo ante the lease-disaffirmance, and would have disregarded the "prior lien" claim by not deducting from the allocation to the Old Colony bondholders some $10,500,000. Instead, the Commission treated the disaffirmance as a stern reality, by dealing with Old Colony as a distinct entity, the property of which the new New Haven is to acquire at a "sale."

8. To such a reorganization of Old Colony, via a "sale," the doctrine of the Milwaukee case has, I think, no relevance. For that case had to do solely with an intra-system reorganization, by way of recapitalization, and with the allocation of new securities to the holders of claims against the several divisions or integral parts of the system; the Court, therefore, had no occasion to consider a "sale" under the statutory provision directing that the Commission fix a "fair upset price." The Court spoke of divisions, each of which had contributed earnings to a common fund of "system earnings." The problem there was of finding "the method for bringing * * * divisional mortgages into a new capital structure so that"—what? "So that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels." But here the mortgage on the Old Colony, ever since the lease-disaffirmance on June 2, 1936, has had no relation whatever to any mortgage on any part of the New Haven "in respect of assets and earnings." Consequently, the method of reorganization valuation as between divisional mortgages, approved in the Milwaukee case by the Supreme Court, does not fit the case of the Old Colony mortgage. It could only fit, as I have suggested, if the Plan re-established the status quo ante the lease-disaffirmance. [5]

---

4 § 77, sub. b(5) says that a plan "shall provide adequate means for the execution of the plan, which may include * * * the sale of all or any part of the property of the debtor * * * at not less than a fair upset price * * *"

See similar provisions in Chapter X,

11 U.S.C.A. § 616(7) and (1); Castle Apartments Bldg. Corp. v. Machiewich, 7 Cir., 149 F.2d 55, 58, 59; Country Life Apartments, Inc., v. Buckley, 2 Cir., 145 F.2d 935, 938.

5 The discussion of the treatment of the Terre Haute bonds, in the Milwaukee

434

Where both parent and subsidiary are in bankruptcy-reorganization, pursuant to § 77, sub. a, any plan of reorganization for the subsidiary must be either (1) unrelated to or (2) related to the plan for the parent. Both the alternatives named in § 77, sub. a, refer, of course, to situations where the plans are related. My colleagues' view seems to be that "in connection with" designates merely a relation of simultaneity in the effectuation of the plans, and that "as a part of" designates all other possible relations. I see no basis for such an interpretation. I think "as a part of" includes only those plans in which, for all purposes, the subsidiary is dealt with as part of the parent's system.

9. The basic flaw in my colleagues' reasoning is, I think, that, inconsistently, it "plays it both ways": (1) For the purpose of approving the Commission's method of "valuing" the Old Colony property, in accord with the Milwaukee case doctrine, my colleagues deal with Old Colony as if it had always been operated as an integral part (or division) of the New Haven system, and never, as a separate entity, for "the account of" Old Colony. (2) However, for the purpose of sustaining the New Haven's right, as a creditor of Old Colony, to collect its "prior lien" claim, my colleagues deal with Old Colony as if it had been separated from

the New Haven system on June 2, 1936, had then become a separate entity and had so remained. A plan of that character is a sort of hippogriff. I see nothing in the Act authorizing the creation of such a creature.

The weakness of my colleagues' position also appears in appellee's contention of which my colleagues' opinion approves: Appellees assert that "the legislative purpose" of subsection a "is to *enable continuity of system operation during the proceedings* and after the plan has been put into effect," and that "in such cases the securities of the subsidiary debtor are in the same status as the securities of the principal debtor's divisional obligations," with the consequence that "the provisions in the plan relating to the Old Colony are upon the same footing as those relating to the Housatonics, the New Englands,[6] and the various other divisional liens," all of which, together with Old Colony, "are members of the same family." But the outstanding fact here is that, after the lease-disaffirmance, there was no "continuity of system operation during the proceeding" so far as Old Colony was concerned, for Old Colony ceased to be a "member of the family" on June 2, 1936. A "system" does not operate one of its divisions "for the account of" that division, does not become the creditor (with a collectible prior lien claim) of a division, for that

case, 318 U.S. at pages 546–555, 63 S. Ct. 727, 87 L.Ed. 959, is not in point: (1) The Milwaukee owned a majority of the voting stock of Terre Haute; but the Terre Haute was not itself in reorganization (see 318 U.S. at page 541, note 2, 63 S.Ct. 727, 87 L.Ed. 959). The Terre Haute was under a long-term lease to Milwaukee, the lease providing, among other things, that Milwaukee pay the interest on, and the principal of, the Terre Haute bonds. (2) No disaffirmance of the lease had occurred during the Milwaukee trusteeship; but the Milwaukee trustees continued to operate the Terre Haute lines as part of the Milwaukee "system" operations; therefore the Milwaukee had no claim against the Terre Haute for an "involuntary" operation. (3) The Milwaukee Plan provided that the lease should be disaffirmed, as part of the Milwaukee reorganization, unless (a) a new lease was executed at a specified reduced rental and (b) the Terre Haute bondholders agreed to a modification of the terms of their bonds (among

other things, reducing the interest). (4) If the Terre Haute bondholders elected not to accept this offer, they retained intact their lien on the Terre Haute properties, those properties including a damage claim against the Milwaukee estate on account of the disaffirmance. The Court, 318 U.S. at page 550, 63 S. Ct. at page 742, 87 L.Ed. 959, said that, "if the Commission deems it desirable to keep the leased line in the system, it must necessarily have rather broad discretion in providing modifications of the lease where, as here, the lessor is not being reorganized along with the debtor. For under that assumption the modification must be sufficiently attractive to insure acceptance by the lessor or its creditors. Thus, the question whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment."

6 These are the names of two of the mortgaged divisions of the New Haven system.

division's operating deficits. During the trusteeship, the gross earnings of the true New Haven divisions have all gone into hotch-pot out of which the expenses of each have been paid. Burdens and benefits have been shared. Not so as to Old Colony. It follows then, that, if the New Haven is permitted to collect its claim against the Old Colony, the Old Colony bonds will not be "in the same status as the" New Haven's "divisional obligations." If Old Colony were to be considered in a Plan as part of the New Haven "family," it would be necessary to annul the divorce and to forgive the consequences of that divorce, i.e., the $10,-500,000 "prior lien" claim. The present plan allows the New Haven creditors both to eat and have their cake.[6a]

10. I cannot, therefore, agree with my colleagues that, under a reorganization of a system containing divisions, as in the Milwaukee case, the "transaction by which" a divisional lien is "wiped out" and by which new securities are given to the divisional lien-holders, "is as much a 'transfer' for a 'price' and therefore a 'sale' as is the proposed extinguishment of the lien of the Old Colony bondholders in exchange for new securities." That suggestion confuses (1) a "recapitalization" reorganization, as to which § 77 eliminates foreclosures and foreclosure sales, with (2) a reorganization in accordance with sub. b (5) where an actual "sale" of "property" occurs and where there is an actual "distribution of * * * the proceeds derived from the sale * * * among those having an interest therein." It is no accident that (as I shall show later) the "transaction" as to Old Colony has consistently been called a "sale," while the "transactions" as to the New Haven divisional liens have never been so described.

I should add that I think that a transfer of assets would not be a "sale" within the

meaning of sub. b (5) if the transfer were an incident of a "recapitalization" plan (as, for instance, when, as part of such a plan, the assets of the principal debtor or of the principal debtor and its subsidiaries, are conveyed to a new company).

11. Since the Commission's Plan for Old Colony explicitly provides for reorganization by a real "sale," the statutory command concerning such a sale must, I think, be met. If that be true, the Commission erred in not finding a "fair upset price" for the Old Colony property to be acquired by the reorganized New Haven.

In fixing such a price, the Commission, I believe, must find (1) the fair cash sale value of the Old Colony property thus to be acquired, and (2) the probable market values of the new New Haven securities which, together with the cancellation of the "prior lien" claim, will equal that cash sale value of the Old Colony. The first, clearly, the Commission has not done. (I shall try to show later, in Point II, that, in addition, it has not even done the second.)[7]

It might perhaps be argued that, because the Plan as to Old Colony contemplates not a public sale but merely a sale to a single purchaser, the requirement of an upset price is literally inapplicable. That suggestion I consider without merit, in the light of the notorious fact, well known to Congress when it enacted § 77 that, when a "public" sale is held in connection with the reorganization of a railroad, seldom if ever is there more than one bidder. But conceding, arguendo, that, literally, the upset price provision does not apply to such a sale as that of Old Colony to the New Haven, nevertheless it seems clear to me that the congressional policy embodied in that provision must guide the Commission in such a case. That policy obviously was to protect the security-holders of a road, when re-

---

[6a] *Under the New Haven Plan, the unsecured creditors of the New Haven are participating. If the Old Colony were being reorganized "as a part of" the New Haven system reorganization, would not the unsecured creditors of the Old Colony also be entitled to participate? Under the Plan, they will not receive a cent.*

[7] If the Old Colony Plan were a "recapitalization" plan, I would unhesitatingly agree with my colleagues' conclu-

sion that, in estimating such probable market values, it would be proper to use the "cut-off date," December 31, 1943. However, I am not at all sure that that is the proper date for purposes of a "sale," since those values are to be taken as money's worth at a sale which cannot take place for more than three years after December 1, 1943, and since the long delay is ascribable to the Commission's error.

436

organized through a sale and not through recapitalization, by having the Commission determine the fair cash sale value of its assets.

We must heed that policy, even if not explicit. For it is no longer novel doctrine that a policy plainly implied, although not expressed, in a statute should control in its interpretation. As Mr. Justice Holmes put it in a classic statement, "The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed"; he added that "it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." [8] That statement has several times recently been cited and quoted with approval by the Supreme Court.[9] In Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 195, the Court said, "The policy as well as the letter of the law is a guide to decision." [10] As we said (per Judge Learned Hand) in Federal Deposit Ins. Corp. v. Tremaine, 2 Cir, 133 F.2d 827, 830: "There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over-solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it." [11]

12. At one time, in equity-receivership-reorganizations, upset prices were often employed to club minority dissenters into acceptance of reorganization plans.[11a] Such surely was not the purpose of the "fair upset price" requirement in section 77.[12] The purpose, I think, was to ensure fairness to, not coercion of, those persons having claims against a railroad which is being reorganized through a sale. In any event, since the reorganization of Old Colony is not (as I see it) a part of the New Haven system-reorganization, those persons having interests in Old Colony are not a "minority" with respect to the security-holders and creditors of the New Haven. Nor do a majority of the Old Colony bond-holders favor the

---

[8] Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194.

[9] United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 391 note 4, 59 S.Ct. 516, 83 L.Ed. 784; Van Beeck v. Sabine Towing Co., 300 U.S. 342, 351, 57 S.Ct. 452, 81 L.Ed. 685.

[10] See also United States v. American Trucking Associations, 310 U.S. 534, 542-544, 60 S.Ct. 1059, 84 L.Ed. 1345; United States v. Dickerson, 310 U.S. 554, 561, 562, 60 S.Ct. 1034, 84 L.Ed. 1356; United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 55, 62 S.Ct. 445, 86 L.Ed. 671.

[11] In Cabell v. Markham, 2 Cir., 148 F.2d 737, 739, we said, per Judge Learned Hand, that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." See also L. Hand, How Far Is a Judge Free in Rendering a Decision? (May 14, 1933), quoted in part in dissenting opinion in McAllister v. Commissioner, 2 Cir., 157 F.2d 235, 239 note 3, 240 note 6.

See also Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245; Commissioner v. Ickelheimer, 2 Cir., 132 F.2d 660, 662, 145 A.L.R. 556; Burstein v. United States Lines Co., 2 Cir., 134 F.2d 89, 93; Elizabeth Arden, Inc., v. F. T. C., 2 Cir., 156 F.2d 132, 135; cf. Stone, The Common Law in The United States, 50 Harv. Law Rev. (1936) 4, 13-14.

[11a] Weiner, Conflicting Functions of The Upset Price in a Corporate Reorganization, 27 Col. Law Rev. (1927) 132; Gerdes, Corporate Reorganizations (1936) 1690; Finletter, The Law of Bankruptcy Reorganization (1939) 486; Frank, Some Realistic Reflections on Some Aspects of Corporate Reorganization, 19 Va. Law Rev. (1933) 541, 563–565; Guaranty Trust Co. v. Seaboard Air Line Ry. Co., D.C., 60 F.Supp. 607, 613, 614; American Brake Shoe & Foundry Co. v. Interborough R. T. Co., 2 Cir., 122 F.2d 454, 459.

[12] Finletter, loc. cit., 485, 486; Bonbright, Valuation of Property (1937) Vol. II, 882, note 83.

For comments on a similar provision in former 77B, 11 U.S.C.A. § 207, see Gerdes, loc. cit., 1689, 1690. See also Frank, loc. cit., at 709; cf. First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391.

Plan.[13] The relevant considerations here are therefore entirely unlike those which came into play when an upset price was used to ensure a minimum cash offer to a minority of security-holders of a corporation being reorganized under a recapitalization plan. From all this, I conclude that, in fixing a "fair upset price," the Commission should not use it as bludgeon but, by an appraisal, should determine a cash price which fairly measures the value of the property to be sold.[14]

Wherefore I do not agree with my colleagues that it cannot "make the slightest difference, so far as concerns the appraisal of the property, that there must be deeds to effect the transfer" and that, for this transfer, New Haven is to pay Old Colony a "price."

I have assumed that § 77, sub. b (5) requires that the upset price be fixed by the Commission, not by the judge. The statute does not explicitly so state. But, since the determination of such a price (if that price is to be meaningful) necessarily involves valuation, I think that Congress, since in § 77, sub. e, it assigned the task of valuation to the Commission, intended the Commission to fix such a price. If I am wrong in this respect, nevertheless I think we should here reverse so that the district judge may find the upset price, using the criteria above suggested.

It has been suggested that the legislative history shows that the upset-price provision was intended solely as an adjunct to foreclosure sales which could be employed by those who feared that the "cram-down" provision would be held unconstitutional, and that, therefore, as the Old Colony plan does not contemplate a foreclosure sale, no upset price need here be fixed.[14a] I do not agree with that suggestion. It rests, not on legislative Committee reports or remarks in Congress of the Committee Chairmen, but solely on strained inferences from testimony of some witnesses before the Committees.

13. I have stressed the point that, on June 2, 1936, the operations of Old Colony ceased to be a part of the New Haven system operations, and became a distinctly non-system operation. As this point is crucial, I think it well to amplify it as follows: In Palmer v. Webster & Atlas Nat. Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642, the question was whether the New Haven trustees, after June 2, 1936, were, within 28 U. S.C.A. § 124a, officials "appointed by" a "United States Court" to "conduct" the "business" of the Old Colony and the Boston & Providence. The Court said, 312 U. S. at page 160, 61 S.Ct. at page 544, 85 L. Ed. 642, that, when the New Haven filed its reorganization petition, the "lines of Old Colony and Boston and Providence came into the custody of the court as part of the New Haven system." It then referred to the disaffirmance of the Old Colony lease by the New Haven trustees, the reorganization petition of Old Colony filed on June 3, 1936, and the disaffirmance by the Old Colony trustees of the Boston & Providence lease. The Court then spoke of the orders, pursuant to section 77, sub. c (6), under which "the New Haven trustees have continued to operate both Old Colony and Boston and Providence railroads for the account of the former lessors." The Court said, 312 U.S. at page 163, 61 S.Ct. at page 545, 85 L.Ed. 642: "The question is whether the trustees, who are officers or agents appointed by the court to conduct the business of New Haven, are also within the intendment of the statute, agents who are conducting the business of Old Colony. * * * We think Congress had no such intent." The Court, in explanation, said, 312 U.S. at page 167, 61 S.Ct. at page 547, 85 L.Ed. 842, that, after the disaffirmance, the operation of Old Colony by the New Haven trustees was "[an] *involuntary operation*." It also (see 312 U.S. at page 165, 61 S.Ct. at page 546,

---

13 Of those who voted, a majority voted against the Plan.

14 Cf. First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391.

14a My colleagues have stated this argument somewhat elliptically in saying

that "there is some reason to suppose that" the upset-price provision "was interpolated in 1935 to provide against the possibility that the 'cram-down' provision, also then introduced, might prove unconstitutional."

85 L.Ed. 842), spoke of the New Haven trustees. "who are *not conducting the business of Old Colony or Boston and Providence, as such, but who, under the constraint of § 77 [sub.] c (6), are merely operating lines of those companies to prevent public inconvenience * * *"* [15]

In his opinion of September 19, 1941 (with respect to the Commission's First Supplemental Report), the district judge said, and I think correctly, "The legal situation changed when * * * the Old Colony lease was rejected in these proceedings. Thereafter, the only obligation of the New Haven for Old Colony operations was an obligation * * * limited to operation pending reorganization * * * Such is the necessary implication of Palmer v. Webster & Atlas National Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 842, which held that the involuntary operation of Old Colony by the New Haven Trustees under the Bankruptcy Act, even after its long-continued operation under the lease, *does not justify the Court in disregarding the separate legal entity of the Old Colony* * * * Such also is the implication of Palmer v. Palmer, 2 Cir., 104 F.2d 161 wherein it was held that the segregation formula was a proper basis for the settlement of accounts for the operation of Old Colony after the rejection of the lease. On this basis, Old Colony, of course, was charged with its fair share of the common overhead; the New Haven was not required to furnish the operation gratuitously subject only to exoneration for its out-of-pocket expense. And if for purposes of such accountings *the separate entity of Old Colony must be recognized* and its properties must be held subject to such charges, the same rights and liabilities must have equal recognition in the valuation of Old Colony properties."[16] In approving the Sixth Supplemental Report in connection with his order now on appeal, the district judge referred to the Plan as providing for the acquisition by the New Haven of the Old Colony as the acquisition of "an outside railroad property." That I consider an apt description.

14. The "transactions" proposed in the New Haven Plan with respect to the New Haven divisions have never once in these proceedings been called "sales." On the other hand, never, until my colleagues' present opinion, has any of the several proposed plans for the reorganization of Old Colony been described by anyone except in terms of a "sale" of its property and the "acquisition" thereof by the reorganized New Haven at a "price." Here are the record facts:

The Commission's initial Plan for the New Haven contained in its Report of November 22, 1940, called for a reorganization of the New Haven system as a separate entity, leaving the severed Old Colony to be separately reorganized at some later date. Then, in its First Supplemental Report of February 18, 1941,[17] in which the Commission first provided for an Old Colony reorganization, it referred to "the price to be paid in securities by the principal debtor * * * for the properties and assets of the Old Colony," and went on to say, "In consideration of the transfer and conveyance to the reorganized principal debtor of all assets, properties and franchises of the Old Colony * * * the reorganized debtor shall issue and deliver * * * to the Old Colony's trustees, etc." The district judge, in his opinion on this Report, said, "The amended plan of the Commission proposes that the New Haven be required now to acquire all the properties of the Old Colony paying (now) therefor the following etc." In its Third Supplemental Report,[18] the Commission said, "As a basis for determining the price of Old Colony * * *" In the district judge's opinion of December 21, 1943, on this Report, he twice referred to "the price" to be paid by the New Haven for the Old Colony property and said: "In this plan, like that previously cer-

---

[15] Emphasis added.

As this court said in Palmer v. Warren, 2 Cir., 108 F.2d 164, 166, the inability of the lessor road to operate after disaffirmance should not "falsify the relations between the two roads * * *"

[16] Emphasis added.

[17] Even that Report discussed "the acquisition" by the New Haven "of the Old Colony's properties."

[18] 254 I. C. C. 63.

tified * * * the Commission * * * proposes that the capitalization of the New Haven shall be fixed at $365,000,000. The plan, however, contemplates that the capital structure may be expanded to fill out the purchase price of the Old Colony * * *" In its Fourth Supplemental Report,[19] the Commission said that "since our previous approval of the acquisition of the Old Colony's properties and its purchase price contemplated that the additional reorganization securities to be issued in connection therewith were justified apart from and in addition to the total capitalization approved by us for the reorganized principal debtor, we will make provision in the plan that the over-all capitalization shall be increased in the amount necessary to include the corrected amount of new securities to be issued as part of the purchase price." Since then, in its subsequent Reports, the Commission has adhered to this theory of the reorganization of Old Colony as one founded upon a "sale" to the New Haven. Thus in its Fifth Supplemental Report [20] (approved in the Sixth)[21] the Commission said that it had provided for "the acquisition of the Old Colony's properties by the reorganized principal debtor for a certain consideration and upon certain conditions." In its Sixth Supplemental Report, it repeatedly speaks of the New Haven's "acquisition" of the Old Colony property and states "the price to be paid for the acquisition." And the Commission has explicitly recognized that the Old Colony Plan is not "a part of" but separable from the New Haven Plan: Its order. appended to its Fifth Report, again approved in the Sixth, provides that, if any part of the provisions of the Plan as to Old Colony is held invalid, the "court may delete * * * all provisions relating to the acquisition by the principal debtor New Haven of the property and assets of the Old Colony, whereupon this order as thus

modified may be deemed to state a separate plan for the reorganization of the principal debtor."

The district judge has always spoken of the several proposed Old Colony Plans as built upon a sale.[22] And so, heretofore, have we. In 147 F.2d 40, 50, we said that the Commission exercised no independent judgment "in fixing the *purchase price for Old Colony assets*," and that the compromise "was the dominant factor in the Commission's formal finding that the *purchase price* is fair and equitable. * * * We conclude that the district court's order of approval must be reversed so that the Commission may make its own independent *findings of value and of price*." [23] In 150 F.2d 169, we said: "The prior appeal * * * was from an order approving a plan of reorganization which contained provisions for the *purchase by New Haven of Old Colony assets.* * * * The prior appeal decided nothing respecting the provisions affecting Old Colony except that the Commission *had not made independent findings of value and of price* and the statute [so provided.]" [24] Discussing the Sixth Supplemental Report,[25] we went on to say that it could be sustained only if it "made an *independent finding as to 'value' as well as 'price,' for not only would this seem to be an inevitable step in fixing a price but it was plainly required by our opinions.*" [26]

These consistent descriptions of the Old Colony Plan as founded on a "sale" have not been accidental. It was not a mere chance that the Commission so characterized it. Such a locution has never been used concerning the New Haven system divisions, for the very good reason that they are not being "sold." [26a]

15. Because, then, of non-compliance with Section 77, sub. b (5), I think we should reverse and remand.

---

19 254 I. C. C. 405.

20 257 I. C. C. 9.

21 266 I. C. C. 195.

22 Thus in his opinion concerning the Sixth Report, he speaks of the "price" proposed and the "purchase price."

23 Emphasis added.

24 Emphasis added.

25 It had then been published **but was** not as yet before us.

26 Emphasis added.

26a So far as I know, the thesis that the Old Colony mortgage should be regarded as a "divisional lien" was not presented to, or discussed by, the Commission, by the district judge, or by this court in its previous opinions; that thesis, I think, was first suggested by appellees in their briefs on the present appeal.

## II.

*Assuming,* arguendo, *that the Old Colony bonds may be regarded as having a "divisional lien," the Commission's "valuation" is nevertheless fatally defective, because the Commission did not exercise its independent judgment in fixing the Old Colony "valuation."*

I shall now assume, arguendo, that my colleagues correctly hold that § 77, sub. b (5), may be forgotten, and that the lien of the Old Colony mortgage may properly be regarded (despite the deduction from the "price" of the "prior lien" claim) as if it were a lien on a divisional or integral part of the New Haven system. Even on that assumption, I think the Commission erred.

On that assumption, 1 do agree that, to the Commission's valuation of the Old Colony assets, we must apply the doctrine of the Milwaukee case, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, and related cases. Also, on that assumption, I agree that that valuation, although the Commission's method is opaque, would be beyond effective criticism by this court—*if* there were nothing of record to occasion the most serious doubts as to whether the Commission reached its conclusion by the exercise of its own independent judgment.

But, as I shall try to show, there is much of record amply to justify such doubts. The situation here is like that which sometimes occurs with respect to a jury trial: A general verdict, once it has been entered and the jury discharged, cannot usually be impeached by evidence that it was reached by throwing dice.[27] However, if before a general verdict is entered and the jury discharged, the jurors inform the judge that they employed gambling techniques, obviously the verdict must be held a nullity.[28] Similarly, if a trial judge who tried a jury-less case—although he made special findings of fact which ordinarily, when supported by substantial evidence, would sustain his decision—were to reveal of record that his actual decisional process was that of Judge Bridlegoose,[29] no appellate court would hesitate to reverse his judgment. Substantially that condition exists here: The Commission, in its latest Report, published a valuation formula which, in ordinary circumstances, if the Milwaukee case doctrine applies, would preclude judicial inquiry; but the record tends strongly to show that the valuation derived not from the formula which the Commission purported to use but from methods unauthorized by the statute.

The trouble began when the Commission's so-called First Supplemental Report, of February 18, 1941,[30] came before the district judge. That Report provided that, as the "price" of the Old Colony assets to be sold to the New Haven, the Old Colony bondholders were to receive, "as fair and equitable" treatment, new New Haven securities in the face amount of $16,448,000 (consisting of $2,467,200 of new First and Refunding Bonds, $3,298,600 of new Income Bonds, $5,345,600 of new Preferred stock, and $5,345,600 of new common stock).

The district judge, holding that this "price" was excessive and therefore unfair to New Haven security-holders, remanded the Plan to the I. C. C. But, before he did so, the judge—saying, in his (unreported) opinion of September 19, 1941, that the usual procedure (explicitly prescribed by the statute) for Commission valuation, would undesirably delay reorganization—appointed a "compromise" committee, consisting, not of persons chosen by a vote of the security-holders, but of persons he named to represent the Old Colony and New Haven interests, respectively. This Committee having rendered a tentative report of a proposed compromise, the judge, in returning the Plan to the Committee, in effect recommended that it act on that report. In this connection, the judge said:

---

[27] See, e.g., McDonald v. Pless. 238 U. S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Fabris v. General Foods Corp., 2 Cir., 152 F.2d 660.

[28] Cf. United States v. Pleva, 2 Cir., 66 F.2d 529, 533.

[29] See Rabelais, Gargantua and Pantagruel, Bk. 3, Chapters 39-43. Judge Bridlegoose explained that, after the parties to a case had filed elaborate pleadings and much evidence, he reached his decision by shaking dice. If the papers were voluminous, he used little dice; but if few, so that the issues were plain, he used big dice.

[30] 244 I. C. C. 239.

"But we have already had ample demonstration of the difficulty of proceeding by the process of litigation in a controversy so complex and so fundamental as that involved in the proper disposition of Old Colony problems. There is not only the difficulty of evaluating Old Colony properties but also the difficulty (on which apparently little progress had yet been made) of evolving 'an appropriate formula for at least an approximate ascertainment' of the value of the consideration which the New Haven shall pay for Old Colony properties, in accordance with the standard set by the Supreme Court in Consolidated Rock Products Company v. DuBois, 312 U.S. 510, 525, 61 S.Ct. 675, 85 L.Ed 982. The best prospect of prompt progress appears to be by reasonable compromise." The Compromise Committee, subsequently somewhat enlarged, after engaging in what the district judge later called "negotiations,"[31] revised the compromise proposal and issued a so-called "Joint Report" which was received in evidence by the Commission.

With but minor changes, this modified compromise was adopted in a revised Plan by the I. C. C. in its Third, Fourth and Fifth Supplemental Reports.[32] This new Plan, pursuant to the compromise "negotiations," allotted to the Old Colony bondholders but $7,697,033 face amount of new securities, as the "fair and equitable price" for the assets to be acquired by the reorganized New Haven, in place of the $16,448,000 previously allotted as that "price" in the Commission's First Supplemental Report. This reduced allocation consisted of $4,398,305 of First and Refunding bonds and $3,298,728 of Income bonds, or an aggregate face amount of new securities in the amount of $7,697,033. Thus the face amount of First and Refunding bonds was increased by $1,122,105, but there was eliminated the allotment of $5,345,600 of Pre-ferred and of $5,435,600 of common. *The net reduction in face amount of new securities was accordingly $8,790,967.* This reduced price "was on the basis of December 31, 1943."[33]

*The Commission explicitly conceded that this price was "smaller in amount than that which we formerly determined," but explained this reduction by saying that it had adopted the compromise because it "afforded the best prospect of prompt progress."[34] On that basis alone, the Commission "found" that this "price" was "fair and equitable."*

When this revised Plan, embodied in the Third, Fourth and Fifth Supplemental Reports, came before the district judge, he approved. On appeal from his approval order, we reversed—2 Cir., 147 F.2d 40, 48–51—on the ground that, if there was one matter which could not be compromised by some of the parties, and on which the I. C. C. was required to act on its own, guided solely by its independent judgment, that matter was "valuation." In remanding, we emphasized the fact that the compromise had been "adopted by the Commission *without * * * stating reasons for the enormous reduction in its earlier valuation*" of Old Colony assets,[35] and said that the Commission's "formal finding" that the valuation was "fair and equitable * * * might perhaps suffice if the Commission had stated the reasons which led it to reduce * * * its prior valuation." We added: "It is possible, of course, that the Commission may still adhere to figures which are the same as those of the Joint Report. Such correspondence would not of itself invalidate the Commission's conclusions *if it 'shall state fully the reasons for its conclusions' * * ** and such reasons are not the pressure exerted by the compromise."[35a] But this was very far from saying that such a "correspondence" would

---

[31] See D.C., 54 F.Supp. 595, 611.
[32] 254 I. C. C. 63; I C. C. 405; 257 I. C. C. 9.
[33] See 54 F.Supp. 595, 613.
[34] See 254 I. C. C. 63, 96, 99. Emphasis added.
[35] Emphasis added.
[35a] We said, 147 F.2d 40, at pages 49, 50: "Section 77 requires an independent determination by the Commission that the plan is 'fair and equitable'. The heart of such a determination is a finding of fact by the Commission as to the value of the debtor's property. It follows that that finding cannot be based upon the consent of some of the interested parties but must be a conclusion independently reached by the Commission upon a consideration of the evidence. One of the purposes of section 77 was to

be acceptable regardless of the character of the "reasons."

Pursuant to our mandate, the district judge remanded the Plan to the I. C. C. That body—purporting this time to exercise its untrammelled judgment—in its

Sixth Supplemental Report (261 I. C. C. 195) arrived at a valuation for Old Colony, and a consequent allotment of securities to the Old Colony bondholders, which are precisely the same as those contained in the improper compromise Plan which we had

do away with an evil prevalent in reorganization through equity receivership proceedings, namely, the customary practice of submitting to the court a plan already consented to by a large proportion of the old security holders and thus exerting pressure on the court to approve it against objections of minorities, because failure to do so would mean the upsetting ,of a fait accompli and the undoing of an immense amount of effort and negotiation. * * * Section 77 'manifests the intention of Congress to place reorganization under the leadership of the Commission' (Ecker v. Western Pac. R. Corp., 318 U.S. 448, at page 468, 63 S.Ct. 692, at page 705, 87 L.Ed. 892), and we cannot doubt that the Commission must approve the plan in the exercise of an independent judgment uninfluenced by the fact that interested parties have agreed upon its terms. Consequently it would be a serious departure from the statute if the Commission approved a valuation for Old Colony assets because of fears that, should it fix any other, a previous agreement negotiated by a substantial number of interested security holders would be upset, with consequent delay in consummating a reorganization.

"The Commission's third supplemental report, 254 I. C. C. 63, with respect to the Old Colony purchase price is substantially a copy of the Joint Report changed only to meet the requirements of a report by the Commission. The Commission said, 254 I. C. C. at page 96: 'As seen herein, the principal debtor and its major secured creditors, the Old Colony and the mutual savings bank group, the latter holding more than one-half of the bonds of the Old Colony, and a representative of the public, an assistant attorney general of the Commonwealth of Massachusetts (it was understood that any agreement of the assistant attorney general would not be binding on the Commonwealth), have agreed upon a compromise purchase price. The basis of the compromise has been fully explained. The desirability, in some situations, of a compromise has been stated by the Supreme Court in Case et al. v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. While the agreed purchase price is smaller in amount than that which we formerly determined, upon further consideration, we

find that the purchase price proposed in the joint report is fair and equitable, and, in our opinion, conforms to the principles which the court in its opinion indicated governed, and we will modify the plan accordingly.'

· "Again, 254 I. C. C. at page 99, the Commission said that 'the court * * * indicated that in its opinion the best prospect of prompt progress appeared to be by reasonable compromise.' It said also that while the principal New Haven and Old Colony parties 'have evolved an agreed basis for inclusion of the Old Colony in the reorganization,' certain of Old Colony's security holders and representatives of the Commonwealth of Massachusetts 'strongly oppose such agreement.' It then added 'In our opinion, and we have so found, the agreement in respect of the Old Colony, with minor modifications made therein by us, offers a fair and equitable solution of these problems.'

"We find it difficult to read the third supplemental report and draw any inference other than that the agreement of the parties was the dominant factor in the Commission's formal finding that the purchase price is fair and equitable. This formal finding might perhaps suffice if the Commission had stated the reasons which lead it to reduce by some $10,000,-000 face value of the new securities its prior valuation, but we find no reference to facts causing such change unless it be the compromise approved by the parties. Moreover, in its fourth supplemental report (254 I. C. C. 405, 422, [433]) the Commission, after discussing a proposal by the Commonwealth of Massachusetts with respect to Old Colony, makes the following significant statement: 'It is likewise clear that to mod'fy materially the provisions of the joint report in respect of the Old Colony would be to nullify the compromise agreement reached after extended negotiations with little or no expectation that the suggested modification would prove acceptable to the interested parties. The result again would be a further delay in the consummation of the reorganization of the principal debtor and the Old Colony.'

"We cannot read this otherwise than as meaning that the Commission accepted the compromise of the joint report for fear that any material modification of it,

disapproved (the price again being as of December 31, 1943).[36]

Such a striking coincidence certainly demands a rational explanation. To be sure, as we had indicated, abstractly it would not be impossible that (1) the result of the Commission's utilizing its own independent judgment might exactly coincide with (2) the previous result when the Commission unlawfully accepted the compromise. But, undeniably, this matching would be highly improbable.[37] True, an improbability, adequately explained, would not warrant reversal; for the improbable—by definition being not impossible—sometimes does occur.[38] The highly improbable, however, does call for considerable explication. To put it bluntly, the complete identity, as to the Old Colony "price," of the former and present Plans raises the gravest doubt whether the present price is the product of the Commission's independent judgment, whether it is still not acting on the basis of the invalid compromise. Because that grave doubt, as I shall try to show, is not allayed by any intelligent explanation by the Commission of this astonishing coincidence, I think it requires reversal.

Here I rely on frequent expressions of the appropriate judicial attitude towards improbabilities. While improbable coincidences are susceptible of proof,[39] since, it has been said, "almost all things are possible,"[39a] yet the courts have often eyed skeptically, as suspicious "afterthoughts," evidence at a new trial which has been changed to meet the views of a court which had reversed the previous judgment.[40] The

---

which the Commission might have independently approved as fair and equitable, would be unacceptable to the parties and would result in delay in consummation of a reorganization. That is to say, the Commission was influenced by the pressure of the compromise agreement and by the fear that a large block of security holders of New Haven would not consent to a plan materially different. We think the appellant has substantiated its contention that the Commission exercised no independent judgment in fixing the purchase price for Old Colony assets but followed the easy route of accepting the compromise. The appellees argue that the Joint Report was not an agreement binding upon those who signed it. Of course it could not be binding until a plan embodying its provisions was approved by the Commission and the judge. But whether or not it was a binding agreement is immaterial if it caused the Commission to refrain from exercising an independent judgment as to the value of the Old Colony assets. We conclude that the district court's order of approval must be reversed so that the Commission may make its own independent findings of value and of price. It is possible, of course, that the Commission may still adhere to figures which are the same as those of the Joint Report. Such correspondence would not in itself invalidate the Commission's conclusions if it 'shall state fully the reasons for its conclusions,' as required by section 77, sub. d, and such reasons are not the pressure exerted by the compromise."

[36] Indeed the Commission concludes the Sixth Report with an order which merely approves "the provisions of the plan * * * relating to the price to be paid for acquisition" of the Old Colony assets, which the Commission had approved in its Fourth and Fifth Reports.

[37] "Improbability" is used here in its colloquial sense of "unlikely to occur."

Fortunately, there is no need here to go into the refinements of the mathematical and philosophic theories of probability. See, e.g., Jevons, Principles of Science (2d ed. 1877) Ch. X; Riechenbach, Experience and Prediction (1938) Ch. V; A Symposium on Probability, by Williams, Nagel, Riechenbach, and Carnap, 5 Phil. and Phen. Res. (1945) 449-532; Cohen, A Preface to Logic (1944) Ch. VI; Cohen and Nagel, Logic and Scientific Method (2d ed. 1936) 13-16, 151-172; Probability, in 12 Encyc. of Soc. Sciences (1934) 426; Russell, Philosophy (1927) Ch. XXV; Bridgman, The Intelligent Individual and Society (1938) 98-101.

[38] See, e.g., cases cited in Arnstein v. Porter, 2 Cir., 154 F.2d 464, 469, notes 5 and 6.

[39] Buser v. Novelty Tufting Machine Co., 6 Cir., 151 F. 478, 491.

[39a] Moore, Facts (1898) § 136; Shepard v. Lewiston, etc., R. Co., 101 Me. 591, 65 A. 20; Snyder v. Mutual Life Ins. Co., 22 Fed.Cas. 740, 745; Sutcliffe v. Iowa State Traveling Men's Ass'n, 119 Iowa 220, 93 N.W. 90, 93, 97 Am.St.Rep. 298; cf. Chicago, B. & Q. R. Co. v. Gelvin, 8 Cir., 238 F. 14, 23, L.R.A. 1917C, 983; Walters v. Syracuse R. T. Ry. Co., 178 N.Y. 50, 52, 70 N.E. 98.

[40] C. & A. Potts & Co. v. Creager et al., 6 Cir., 97 F. 78, 86 (Taft, J.); Hale & Kilburn Mfg. Co. v. Norcross, 199 Pa. 283, 49 A. 80, 82; cf. Taylor v. Harwood et al.; 23 Fed.Cas. 773, at page

courts have also held that a very improbable story requires "strong corroboration,"[41] and that "inherently improbable" testimony, not adequately explained, should be disregarded.[42] "The circumstances of a case may be such as to make" evidence "utterly incredible, although there are confident attestations in support of it," said Lord Stowell.[43] A court, remarked Judge L. Hand, is not obliged to close its eyes "and assume a credulity which no sensible man can * * *"[44] Improbable evidence has been held insufficient to justify interference with a man's rights.[45] Evidence, as to human conduct or facts, flatly contrary to general knowledge and common experience will not be accepted.[46] The "eye of the law" will not "be blinded" by incredible statements,[47] statements "beyond the pale of credibility."[48] Rational belief, it has been said, is subjected to an enormous strain by improbable coincidences.[49] Where the probabilities against a coincidence are mathematically high, it is to be rejected.[50] The same is true of statements "against common experience and observation."[51] Particularly is this the case where contradictory statements have been made.[52] "The fact that a witness has told several stories involving similar fortuitous events tends * * * to create a conflict between his testimony and normal experience."[53] The evidence to support such improbabilities must be strong.[54] "The measure of proof required to establish any proposition must necessarily vary with its degree of probability,"[55] and must be strong in proportion to the degree of improbability.[56]

[41] 777 (Taney, J.); Pacific Steam Whaling Co. v. Grismore, 9 Cir., 117 F. 68, 70; Ueberweg v. La Compagnie Generale Transatlantique, 2 Cir., 60 F. 461, 464; Carter v. Carter, 5 Fed.Cas. 205, 210; Phettiplace v. Sayles et al., 19 Fed.Cas. 467, 469; Timolat v. Philadelphia Pneumatic Tool Co., C.C., 131 F. 257, 263; Moore, loc. cit., § 1059.

[41] Moore, loc. cit., §§ 93, 1146; Smith et al. v. Davis, C.C., 34 F. 783, 784; cf. The William Gray, 29 Fed.Cas. 1300, 1302.

[42] The Dauntless, 9 Cir., 129 F. 715, 721; Allen v. Collins, 8 Cir., 52 F.2d 708, 709; Fire Ass'n v. Weathered, 5 Cir., 54 F.2d 779; Emanuel v. Kansas City T. & Tr. Co., 8 Cir., 127 F.2d 175, 180; Cohen v. Commissioner, 2 Cir., 148 F.2d 336; Quock Ting v. United States, 140 U.S. 417, 420, 11 S.Ct. 733, 35 L.Ed. 501; Moore, loc. cit., § 137. Cf. American Casualty Co. v. Windham, 5 Cir., 107 F.2d 88, 89.

[43] The Argo, 1 C. Rob. 158, 159, quoted in Moore, loc. cit., § 140; see also Hardy v. Harbin, 154 U.S. 598, 601, 14 S.Ct. 1172, 22 L.Ed. 378.

[44] Ramopa Co. v. A. Guston & Co., D. C., 278 F. 557, 559.

[45] Fowler v. Roe, 11 N.J.Eq. 367, 368, 369.

[46] Hunter v. New York, O. & W. R. Co., 116 N.Y. 615, 23 N.E. 9, 6 L.R.A. 246; Gurley v. Missouri Pacific R. Co., 104 Mo. 211, 16 S.W. 11, 17; Groth v. Thomann, 110 Wis. 488, 86 N.W. 178, 181.

[47] Hook v. Missouri Pac. Ry. Co., 162 Mo. 569, 63 S.W. 360, 362.

[48] Kramme v. The Ship New England, 14 Fed.Cas. page 852, No. 7,930.

[49] Cf. In re Gaines' Will, 84 Hun 520, 32 N.Y.S. 398, 402; Mack v. Spencer Optical Mfg. Co., C.C., 52 F. 819, 821.

[50] George T. Bisel Co. v. Welsh, C.C., 131 F. 564, 566; 4 Amer.Law Rev. (1869) 625; Moore, loc. cit., §§ 165, 605.

[51] New York & Brooklyn Ferry Co. v. Moore, 102 N.Y. 667, 6 N.E. 293, 298; Whelen v. Osgoodby, 62 N.J.Eq. 571, 50 A. 692; Vreeland v. Vreeland, 48 N.J.Eq. 56, 21 A. 627; Gardner v. Weston, 18 Iowa 533, 535; Lee Sing Far v. United States, 9 Cir., 94 F. 834, 838.

[52] Dougall v. Dougall, 61 App.Div. 282, 70 N.Y.S. 336; Moore, loc. cit., I, § 172, p. 219.

[53] Mintz v. Premier Cab Ass'n, 75 U.S. App.D.C. 389, 127 F.2d 744.

[54] Chandler v. Town of Attica, C.C., 22 F. 625, 627; Gorman v. Hand Brewing Co., 28 R.I. 180, 66 A. 209; Gardner v. Gardner, 2 A.C. (Eng.) 723, 730, 736; Sharpe v. Crispin, L. R. P. & D. 611, 621.

[55] Haworth v. Stark, C.C., 88 F. 512, 514.

[56] Murray v. White, D.C., 9 F. 562, 564; The Gratitude v. The Eutaw, D.C., 14 F. 479, 481; The El Dorado, D.C., 27 F. 762, 763; Smith et al. v. Davis, C.C., 34 F. 783, 787; The America, D.C., 95 F. 191, 192; Merritt & Chapman D. & W. Co. v. North German Lloyd, D.C., 120 F. 17, 27; George T. Bisel Co. v. Welsh, C.C., 131 F. 564, 566; Wood v. Hubbell, 10 N.Y. 479, 481; Morrison v. Dominion National Bank, 169 Va. 191, 192 S.E. 707, 711; Moore, loc. cit., § 32.

For those who are more impressed by Latin than English or American, there is the maxim, "In obscuris inspici soler-

So here: Because of the so-called "presumption" that public officials do their duty,[57] and because ordinarily the Commission need not "formalize in findings the numerous data on which it relied in the exercise of its expert, informed judgment,"[58] the Commission's discussion of the reduced Old Colony price in its Sixth Report (although, as my colleagues' opinions show, by no means exquisitely lucid) would have been sufficient as expressive of the broad outlines of its reasoning—*if* that Report had not been preceded by its previous Reports. But, as those prior Reports unmistakably disclosed an improper adoption of the compromise, a heavy burden rested on the Commission to show a rational exercise of its own informed judgment, when, in the Sixth Report, it adhered to the "negotiated" compromise price. To overcome the inescapable suspicion of impropriety engendered by the improbable coincidence, to rebut the resultant inference of a continued statutory violation by the Commission, it was necessary, I think, that the Commission "state its reasons" far more extensively than if it had not theretofore, by employing forbidden means, fixed the very same price. It was, I believe, necessary that it report convincingly, in some detail, the reasoning by which it again arrived at its determination of this price.[58a] The Commission in its Sixth Report did nothing of the kind.

As noted above, when we rejected the previous earlier Reports as to Old Colony, we specifically said that the Commission had not given its "reasons for the enormous reduction in its earlier valuation," that it was "possible" that the Commission would adhere to the compromise figure, and that "such correspondence would not in itself invalidate" such a conclusion—*if* the Commission should "state fully the reasons" therefor. But the "reasons" given in the Sixth Report for that "correspondence" are pitifully lame. They must be read in the light of the fact, also noted above, that, when in its earlier Reports, the Commission adopted the compromise, it freely admitted that, because of the compromise, the "price is smaller in amount than that which we formerly determined."

In its "reasons" given in the Sixth Report the Commission seeks, in effect, to retract that admission; it now says that the present price is actually not smaller. Its "reasons" (not discussed by my colleagues) consist solely of the following statement:

"It is true that the modified purchase price is smaller in face amount of reorganized securities than the purchase price approved in our report of February 18, 1941.[59] It will be seen, however, that if the probable market value of the total amount of reorganization securities first approved by us as fair and equitable be *computed at the rates assigned* such securities by the *expert testimony of record,* an aggregate valuation of $5,277,966 (*computed at the same rate*) for the total amount of reorganization securities found by us as fair and equitable in the Third, Fourth, Fifth and Sixth Reports."[59a]

This conclusion, the Commission showed in a note, was reached by taking "probable market values" (as of December 31, 1943) for the new securities, according to the "expert testimony," as follows:

"Computation of market values of securities comprising *purchase price approved by report of February 18, 1941.*

| First & ref. bonds | $2,467,200 at 90 — | $2,220,480 |
| Income bonds | 3,289,600 at 40 — | 1,315,840 |
| Preferred stock | 5,345,600 at 20 — | 1,069,120 |
| Common stock | 5,345,600 at 10 — | 534,560 |
| Totals | 16,488,000 | 5,140,000 |

"Computation of market values of securities comprising purchase price approved by report of October 6, 1942, *as modified*

---

quod verisimilius est, aut quod plerumque fieri solet."

[57] See, e.g., United States v. Chemical Foundation, 272 U.S. 1, 14, 15, 47 S.Ct. 1, 71 L.Ed. 131; Peninsula Corp. v. United States, D.C., 60 F.Supp. 164, 180.

[58] Milwaukee case, 318 U.S. 523, 528, 63 S.Ct. 727, 87 L.Ed. 959.

[58a] "Panurge was somewhat incredulous in the matter of believing that it was morally possible Bridlegoose should have been for such a long space of time so continually fortunate in that aleatory way of deciding law debates. Epistemon said to Pantagruel * * * In good sooth such a perpetuity of good luck is to be wondered at." Rabelais, loc. cit., Ch. 43.

[59] I.e., The First Supplemental Report.

[59a] Emphasis added.

*and corrected by report of February 8, 1944.*[60]

| First & ref. bonds | .... | $4,398,305 at 90 — | $3,958,475 |
|---|---|---|---|
| Income bonds | ........ | 3,298,728 at 40 — | 1,319,491 |
| Totals | .............. | 7,697,033 | 5,277,966" |

This "reasoning" of the Commission has several notable features. In the first place, it now maintains that, in practical effect, on the basis of the "expert testimony," the $7,697,033 figure is slightly higher than the previous $16,488,000 figure as fixed in the Commission's Report of February 1941. Yet the judge, on the objection of the New Haven security-holders, had earlier rejected that $16,488,000 price as too high and as unfair to those security-holders; and the $7,697,033 price had resulted from the compromise "negotiations" which, avowedly were intended to reduce the previous price. If the Commission is correct—if the $7,-697,033 price is in fact somewhat higher than the earlier $16,488,000 price—it is difficult to understand why the New Haven security-holders do not object to the $7,697,-033 figure, and why the judge did not reject it. It is strange, too, that the Commission nowhere mentioned this suggestion in its Third, Fourth and Fifth Supplemental Reports, instead of then explaining that the Commission had lowered the price pursuant to the compromise because adoption of the compromise "afforded the best prospect of progress." Pretty plainly, the Commission's recent resort to the alleged "probable market values," in order to justify the reduction, is a feeble "afterthought."

In the second place, the *Commission rests its computations—and thereby its attempted justification of the "enormous" price reduction—not at all on its own determination of "probable market values," as of December 31, 1943, but entirely—on what? On computations "at the rates assigned by expert testimony of record."* Inasmuch as the reduction resulted principally from the elimination of $5,345,600 of new Preferred and $5,345,600 of new Common, it is of the utmost importance to see just what was that "expert testimony of record" as to those securities. Here it is in its entirety:

At a Commission hearing held on February 7, 1942, Davis, an experienced investment banker, first testified that, with "market conditions as they exist today," he estimated that the new First and Refunding bonds would sell at about 90, and that the Income bonds (to appraise which, he said, "is a considerably harder job") would sell between 40 and 45. He was then asked:

"Bearing in mind the same facts as those which you have in mind in discussing the probable market price for New Haven new fixed interest bonds, and new income bonds, have you an opinion as to the market price of the new preferred stock and of the new common stock?" He answered: *"Well, I suppose I must answer that question. I am most reluctant to do so because when it comes to appraising preferred and common stock, there are so many more factors that enter into the equation that make the guess much more hazardous. I would say, with the same set of facts that I make my guess for the mortgage bonds, for the income bonds, I would say around 20 for the preferred stock and around 10 for the common stock."* On those last three sentences, nothing more, the Commission rests entire explanation of how its alleged independent reasoned judgment happens to match, to a penny, the negotiated compromise.

The explanation becomes the more remarkable when it is observed (1) that Davis testified only as to market values as of the time he gave his testimony (i. e., February 7, 1942), but that (2) the date as of which the Commission avowedly purported to accept his estimate of those market values is December 31, 1943—or 22 months later. Surely estimates of the "probable market values" of more than $10,000,000 of Preferred and Common, based exclusively on Davis' 22-month-old brief, hesitant and exceedingly tentative guess, cannot alone serve to justify the "enormous reduction" in the "fair and equitable" price, nor serve to supply a rational explanation of that amazing coincidence.

---

[60] Emphasis as in original.

The following shows that the Commission acted deliberately in relying exclusively on Davis' testimony, and knowingly failed to make its own estimates of probable market values: In his opinion of December 21, 1943, the district judge, discussing the Commission's treatment, in the Third and Fourth Reports, of the claims of certain banks, had said that it could only be sustained if the new First and Refunding bonds had an estimated market value. He went on to say that he could discover no finding by the Commission as to that value, that the record contained nothing on that score other than Davis' testimony, and that, until the Commission itself made a finding on that subject, he could not approve that item of the Plan.[61] In the face of that specific warning from the judge that "probable market values" could not be used unless based on the Commission's own finding, the Commission, in the Sixth Report, in its purported justification of the Old Colony price, made no such finding.

Perhaps more significant is this fact: Reliable data bearing on the probable market values, as of the critical date, December 31, 1943—far more reliable than Davis' reluctant half-hearted guess of twenty-two months before that date—were peculiarly accessible to the Commission when it made its Sixth Report, on May 14, 1945, some sixteen months after the critical date. The Commission's failure to refer to such reliable data, and to make its own finding, cannot, I think, be ignored. Apposite here are the cases holding that, when circumstances create an inference of misconduct, so that a party has the burden of explaining away that inference, his failure to produce evidence, peculiarly available to him, which would yield such an explanation, supports and strengthens the inference. See, e. g., Interstate Circuit v. United States, 306 U.S. 208, 225, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610, where the Court said, in such circumstances, "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.[62] * * * Silence then becomes evidence of the most convincing character."[63] And evasive answers by a party on a crucial point warrant the drawing of an inference that a candid answer would have been adverse to his position.[64] Wherefore, although I would favor judicial acceptance of the Commission's own opinion about the probable market values,[65] I think the Commission's explanation, which sedulously avoids any statement of its own opinion and refers exclusively to the Davis testimony, should be rejected.

The trial judge, in his elaborate opinion of August 31, 1945, said: "I conclude, therefore, that the Sixth Supplemental Report, no more than the Fifth Supplemental Report which preceded it, discloses the use of an improper standard in arriving at the valuation and the corresponding purchase price which I heretofore approved." Which was to say that he still believed that the Commission's previous reliance on the compromise involved no "use of an improper standard." Thus approaching the

[61] As to that particular item, i.e., the Banks' claims, the Fifth Report took care of the judge's objection, not by such a finding but by providing for payment in cash.

[62] Citing Clifton v. United States, 4 How. 242, 247, 11 L.Ed. 957.

[63] Citing Runkle v. Burnham, 153 U.S. 216, 225, 14 S.Ct. 837, 38 L. Ed. 694; Kirby v. Tallmadge, 160 U.S. 379, 383, 16 S.Ct. 349, 40 L.Ed. 463; Bilokumsky v. Tod, 263 U.S. 149, 153, 154, 44 S.Ct. 54, 68 L.Ed. 221; Vajtauer v. Com'r of Immigration, 273 U.S. 103, 111, 112, 47 S.Ct. 302, 71 L.Ed. 560; Mammoth Oil Co. v. United States, 275 U.S. 13, 52, 48 S.Ct. 1, 72 L.Ed. 137; Local 167 v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804.

See also Charles of the Ritz Dist Corp. v. F. T. C., 2 Cir., 143 F.2d 676, 679; Lowenstein v. Reikes, 2 Cir., 60 F.2d 933, 936; Equipment Acceptance Co. v. Arwood Can Mfg. Co., 6 Cir., 117 F.2d 442, 445. Cf. Galloway v. United States, 319 U.S. 372, 386, 387, 63 S.Ct. 1077, 87 L.Ed. 1458.

[64] See, e.g., Cardoza v. Isherwood, 258 Mass. 165, 154 N.E. 859; Kirkland v. Kirkland, 236 Ala. 120, 181 So. 96, 99.

[65] See Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv.Law Rev. (1942) 364, 416-423.

subject, he nowhere in his opinion discusses the central problem posed by the Sixth Report—whether there was an adequate explanation of the startling similarity of the compromise price and the present price.

I submit, then, that the Commission's "valuation," unaccompanied as it is by any rational explanation of that startling coincidence, should not be sustained. As Mr. Justice Holmes once suggested,[66] judges need not be extraordinarily naive. We ought to be at least as wordly-wise as the eminent philosopher who said recently: "On the theory of fair dealing, it is extremely improbable that my opponent will hold four aces twice in succession. When that actually happens, the hypothesis of fair dealing is not refuted; but we may well reconsider it, and entertain the contrary one as a more satisfactory account of the situation."[67]

My reaction here must not be taken as an expression of any general hostility to administrative agencies (nor to the I. C. C. in particular).[67a] On the contrary, I have elsewhere stated in some detail, my objections to blanket denunciations of those agencies as engaged in "administrative absolutism."[68] Such bodies are often, I think, demonstrably indispensable parts of a democratic government in a complicated economy; unduly to hamper their activities by overmeticulous judicial review would destroy their needed usefulness and swamp the courts.[69] Whatever is done, the work of these agencies will never be perfect, no more than that of courts will be, for perfection in matters human is unattainable.[70] Especially is that true when the undertaking relates to "valuation," an exquisitely ambiguous term to describe a prediction, an inherently fallible human guess,[71] which of course cannot be reduced to "mathematical

---

[66] Holmes, Collected Papers (1920) 295.

[67] Morris Cohen, A Preface to Logic (1944) 111.

Pertinent here is Russel Maloney's delightful story of Bainbridge, who heard that "if six chimpanzees were set to work pounding six typewriters at random, they would, in a million years, write all the books in the British Museum." He tried the experiment and reported to a mathematician that his chimpanzees, in a short time, had typed numerous books, including Oliver Twist, Pareto's works, the writings of Anatole France and Trevelyan's Life of Macaulay. Outraged at this assault on the scientific theory of probability, the mathematician shot and killed the chimpanzees. See Maloney, It's Still Maloney (1945) 198.

[67a] See my opinions (favorable to the I. C. C.) in Cornell Steamboat Co. v. United States, D.C., 53 F.Supp. 349; Fordham Bus Corp. v. United States, D. C., 41 F.Supp. 712; see also Woodruff v. United States, D.C., 40 F.Supp. 949; Adirondack Transit Lines v. United States, D.C., 59 F.Supp. 503; Royal Cadillac Service v. United States, D.C., 52 F.Supp. 225.

[68] Frank, If Men Were Angels (1942) passim. See also Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 622, 155 A.L.R. 761, and my dissenting opinion in Duquesne Warehouse Co. v. Railroad Retirement Board, 2 Cir., 148 F.2d 473, 479, 481-485.

[69] Douglas, Democracy & Finance (1940) Ch. XX; Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 622, 623, 155 A.L.R. 761; Frank, If Men were Angels (1942) 143, 146-147, 163-166, 179-181, 184-186.

[70] Frank, loc. cit.

[71] "The fallacy in that argument stems largely from lack of recognition of the eely character of the word 'value.' It is a bewitching word which, for years, has disturbed mental peace and caused numerous useless debates. * * * Reams of good paper and gallons of good ink have been wasted by those who have tried to give it a constant and precise meaning. The truth is that it has different meanings in different contexts, even in the restricted field of 'tax law.' And there, as almost always, 'value' involves a conjecture, a guess, a prediction, a prophesy. * * * For purposes of corporate reorganization, value, generally, is a reasonable capitalization of future earnings as reasonably foreseeable at the date of reorganization; reliance is had upon an educated guess or peering into the future, which being a human conjecture, may be wrong. * * * Anyone who wants to eliminate uncertainties from 'value' will have a sad time getting along in this world. * * * We cannot, by the use of a symbol, 'value,' convert the risky into risklessness, Canute restless change out of existence." Commissioner v. Marshall, 2 Cir., 125 F.2d 943, 946, 141 A.L. R. 445. See also Andrews v. Commissioner, 2 Cir., 135 F.2d 314, 317.

certitude" since it does not result from "mere * * * arithmetical computation."[72] No doubt such a guess about the worth of the assets of a great railroad corporation can frequently best be made by men, like the I. C. C. Commissioners, who specialize in that function. Such "specialists, assisted by experts," are better equipped than most judges to engage in such guessing.[73] For these administrative prophesies, when properly made, become "educated guesses." They are unavoidably, in the last analysis, "intuitive" as, too, are many decisions by judges.[74] But these educated guesses should stem from careful reflection on the evidence.[75]

Congress, I think, was wise to assign to specialists the job of valuing the properties of railroads in reorganization.[76] But the reason for that assignment was that Congress anticipated that these specialists, to the best of their ability, would employ their "trained intuition."[77] When they openly abdicate their judgment, they make a mockery of the administrative process. And not only do they then, most undesirably, bring that process into general disrepute, but, too, they work a serious injury to the interested citizens. Railroad securities are not simply pieces of paper; they are important factors in the lives of those who bought them. In respect of railroad reorganizations, I. C. C. valuation decisions may affect the savings of thousands of persons whose lives, and those of their children, may be drastically changed, for better or worse, by the treatment they receive in the reorganization. The successful maintenance of our profit system depends on fair dealing with a multitude of small investors. Cavalier disposition of their claims is not merely unjust, it is dangerous. Accordingly, when the Commission, entrusted with such important duties, has dicharged them in a way which more than suggests that, to say the least, it acted without adequate care, I think the courts should interfere.

On the previous appeal, we told this Commission that it had violated the statute by surrendering its judgment to others. Reversed, it comes back to us with a report manifesting no real regard for our criticism. The Commission's position now is that we must be satisfied if only it recites a formal abracadabra to which it has added a few words as a sop to us.[78] That position I think should not satisfy this court— not at all because I consider judges inherently better than Commissioners, for I certainly do not,[79] but because Commissioners, like judges, owe an obligation to do their job, as prescribed by statute, in a manner, which, within practical limits, publicizes the rational bases of their performance.

I grant that, because of the "intuitive" factor, sometimes a complete articulation of the reasons for a decision—breaking it up into "legal rules" and "facts"—is all but impossible, since at times the "rules" and the "facts" interact.[80] A decision sometimes may be a patterned "whole" (a "ges-

---

[72] Milwaukee case, 318 U.S. at pages 542, 561, 63 S.Ct. at page 747, 87 L.Ed. 959.

[73] Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220, 221, and cases there cited.

[74] See Pound, The Theory of Judicial Decisions, 2 Cir., 36 Harv.Law Rev. (1923) 940, 951; Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220 note 46.

[75] Cf. Chicago B. & Q. Ry. Co. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 51 L.Ed. 636; Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220, 221, notes 46-50.

[76] However, reduction of delay and better cooperation between the reorganization courts and the Commission might be achieved if § 77 were amended so as to assign to the I. C. C., in substantial part, an advisory role similar to that played by the S. E. C. in Chapter X cases. See New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F.2d 179, 188 note 30; and see suggestion in Monograph of the Attorney General's Committee on Administrative Procedure, Securities and Exchange Commission, 77 Cong., 1st Sess., Doc. No. 10, Part 13, pp. 132-133.

[77] Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220 note 46.

[78] Judicial review, if the Commission is correct, is as important as was the Statute of Uses which, it was said, merely "added three words to a conveyance."

[79] See Frank, If Men Were Angels (1942) 186-188.

[80] Wurzel, Methods of Juridical Thinking, in the volume, The Science of Legal Method (1917) 390, 396-399; In re J.

talt") which, without some artificiality, cannot be thus nicely analyzed.[81] This difficulty is greatest when the credibility of witnesses is involved; but no problem of credibility confronted the I. C. C. here. Moreover, while allowing for the difficulties, government officers, judges or members of administrative agencies, when acting judicially, have an obligation to be as articulate as is practically possible.[82] For no aspect of a democratic government should be mysterious.

If however, the Commission is sustained in this case, and, accordingly, behaves similarly in future cases, then its conduct will indeed be a mystery. Its so-called "valuations" will then be acceptable, no matter how contrived. In that event, it would be desirable to abandon the word "valuation" —since that word misleadingly connotes some moderately rational judgment—and to substitute some neutral term, devoid of misleading associations, such as "aluation," or,

perhaps better still, "woosh-woosh." The pertinent doctrine would then be this: "When the I. C. C. has ceremonially woosh-wooshed, judicial scrutiny is barred." It would then be desirable to dispense, too, with the Commission's present ritualistic formula, "Taking into consideration, etc.,"[83] replacing it with patently meaningless words—perhaps the same words spelled backward, (i. e., "Gnikat otni noitaredisnoc, etc.").[84] Then no one would be foolish enough to believe that the figures in a Commission plan necessarily have anything to do with deliberation, but everyone would know that the figures might well have been the product of omphalic inspiration,[85] or ornithomancy, or haruspication, or aleatory devices, and that the conclusions of the I. C. C. might well be but the conjurations of mystagogues.[86]

This court has said that, while judges, when reviewing administrative agencies, must be modest, must allow for the so-

---

P. Linahan, 2 Cir., 138 F.2d 650, 653 note 16.

[81] See, e.g., Koffka, Gestalt, in 6 Enc. of Soc. Sciences (1931) 642; Timberg, Administrative Findings of Fact, 27 Wash. U. L. Q. (1941) 62, 65; Malone, The Formative Era of Contributory Negligence, 41 Ill. L. Rev. (1946) 151, 170, 179; Ogden, Structural Psychology and The Psychology of Gestalt, in the volume, Rice, Methods in Social Science (1931) 109; Lynd, Knowledge for What? (1945) Chap. II; George, The Scientist In Action (1938) 120, 128, 132, 133, 134, 264, 274, 334; Reichenbach, Experience and Prediction (1938) 100, 220, 221.

[82] United States v. Forness, 2 Cir., 125 F.2d 928, 942, 943.

It is not a thoroughly sound objection to such articulations that, in so far as they attempt to analyze "wholes," they are "rationalizations." For almost all logical analyses are, in that sense, "rationalizations." Logic serves, among other things, to test the validity of conclusions reached by non-logical processes.

See, e.g., Reichenbach, Experience and Prediction (1938) 4-7, 381, 382 (as to the distinction between the "context of discovery" and the "context of justification"); Cohen, A Preface to Logic (1944) 1-3, 115, 116; Cohen and Nagel, Logic and Scientific Method (2d ed. 1936) 18-20, 182, 390; Frank, Law and The Modern Mind (1930) 131 and note, 169 and note.

[83] The Sixth Report concludes thus:

"Upon further consideration and taking into consideration the prior-lien claim of the principal debtor's estate, the uncertainty to which some of the items comprising the non-operating assets of Old Colony are subject, the results of the segregation and severance studies, the probable future segregated earnings and the advantages of the settlement of pending claims; considering also the general public interest; we conclude and find that the price to be paid for Old Colony properties, franchises, and assets upon the terms, and conditions and under the limitations, set forth in the modified plan of reorganization approved by us in our report and order of October 6, 1942, as modified and corrected by our reports and orders of July 13, 1943, and February 8, 1944, should be approved."

[84] Had that been the rule, the Commission's Sixth Report would have concluded thus: "Nopu rehtruf noitaredisnoc dna gnikat otni noitaredisnoc eht roirp-neil mialc etc."

As to the expedient of thus spelling words backwards to avoid misleading the reader, see George, The Scientist In Action (1938) 109.

[85] As to the use of the omphalos in oracular activities, see, e.g., Harrison, Themis (2d ed. 1927) 396-424; Rhode, Psyche (transl. 1925) 97, 110, note 31; cf. Gilbert, James Joyce's Ulysses (1934) Chap. III.

[86] Montaigne said of oracular utterances: "But above all, that which gives

called "expertise" or "professionalism" of such agencies, yet, "just as the non-lawyer can perceive gross errors in a judge's conclusions, so an administrative 'diagnosis,'— like that of a physician's—may be so wanting in any possible logic that judges can say that it lacks all cogency"; we added that "the lack of * * * cogency * * * however, must be fairly gross before judges may reject the diagnosis * * *"[87] In the instant case, I think we have an instance of just such a "gross error."

Doubtless some trial judges, or administrative officers acting judicially, pretend to be doing their duty without in fact doing so, and they may be sufficiently astute so that their derelictions cannot be perceived by a reviewing court. Their hidden misconduct may then be irremediable.[88] But when they attempt such a pretense without effectively concealing the misconduct, a reviewing court should reverse them. That, I think, is the case here.

To condone the Commission's conduct here is to give aid and comfort to the enemies of the administrative process, by sanctioning administrative irresponsibility; the friends of that process should be the first to denounce its abuses. If the courts declare themselves powerless to remedy those abuses, judicial review will become a sham.[89] I neither believe that Congress

---

them the greatest room to play in, is the obscure, ambiguous, and fantastic gibberish of their * * * canting, where they deliver nothing of sense, but shroud all in a riddle * * *." Essays, Bk. I, Ch. 11.

See also the judicial opinion of Rabelais' Pantagruel: "Having seen, heard, calculated and well considered of the difference" between the litigants, "the court saith to them that in regard of the sudden quaking, shivering and hoariness of the flickmouse, bravely declining from the estival soltice, to attempt by private means the surprisal of toyish trifles in those, who are a little unwell for having taken a draught too much, through the lewd demeanour and vexation of the beetles, that inhabit the diarodal climate of an hypocritical Ape on horseback, bending a Crossebowe backwards. The Plaintiffe truly had just cause, * * * with Ockam, to stop the chinks of the gallion, which the good woman blew up with winde, having one foot shod and the other bare, reimbursing and restoring to him, low and stiffe in his conscience, as many bladder-nuts and wilde pistaches as there is of haire in eighteen Cowes, with as much for the embroiderer, and so much for that. He is likewise declared innocent of the case privileged from the Knapdardies, into the danger whereof it was thought he had incurred * * * Slacking therefore the top-saile, and letting go the boulin with the brazen bullets, wherewith the Mariners did by way of protestation bake in paste-meat, great store of pulse interquilted with the dormouse, whose hawks bells were made * * * after the manner of Hungary or Flanders lace, and which his brother in law carried in a Panier, lying near to three chevrons or bordered gueules, whilest he was clean out of heart, drooping and crest-fallen by the too narrow sifting, canvassing, and curious examining of the matter, in the angularly doghole of nastie scoundrels, from whence we shoot at the vermiformal popingay * * * But in that he chargeth the Defendant, that he was a botcher, cheese-eater, and trimmer of mans fleshembalmed, which * * * was not found true, as by the Defendant was very well discussed. The Court therefore doth condemn and amerce him in three porringers of curds, well cemented and closed together, shining like pearles * * * to be payed unto the said Defendant about the middle of August in May; but, on the other part the Defendant shall be bound to furnish him with hay and stubble, for stopping the caltrops of his throat, troubled and impulregafized, with garbardines garbeled shuffingly, and friends as before, without costs and for cause." Rabelais, loc. cit., Bk. 2, Ch. 13.

[87] Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 221, 222.

[88] Since, when a decision turns on the credibility of witnesses, "his [a trial judge's] 'finding' of 'facts,' responsive to the testimony, is inherently subjective (i.e., what he actually believes to be the facts is hidden from scrutiny by others), his concealed disregard of evidence is always a possibility. An upper court must accept that possibility, and must recognize, too, that such hidden misconduct by a trial judge lies beyond its control." Dissenting opinion in La Touraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, 123, 124.

[89] In United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 489, 62 S. Ct. 722, 729, 86 L.Ed. 971, the Court said that if inquiry, as to whether a Commission has employed statutory standards, "is halted at the threshold by reason of the fact that it is impossible to say whether or not those standards

452

so intended, nor interpret the Supreme Court decisions as imputing such an intention to Congress.

In sum, assuming, arguendo, that the Plan properly treats the Old Colony mortgage as a "divisional lien," I think the action of the Commission, because of the absence of a rational explanation, should be held "arbitrary and capricious," and should be set aside. On that ground, if my colleagues' opinion is otherwise correct, I think we should reverse and remand.

---

have been applied, then" judicial "review has indeed become a perfunctory process."

In United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 510, 55 S. Ct. 462, 467, 79 L.Ed. 1023, the Court said of an obscure I. C. C. order, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." See also Colorado-Wyoming Gas Co. v. Federal Power Commission, 324 U.S. 626, 634, 65 S.Ct. 850, 89 L.Ed. 1235.

The long delay should not induce us, because of fatigue, to acquiesce in such an error. We ought not to proceed on the Bridlegoose theory that, if a judicial decision is long delayed, the parties will become so weary of the litigation that the defeated party will be indifferent about the outcome. Rabelais, loc. cit., Bk. 3, Chapters 41 and 42.